#25899-a-SLZ

**2012 S.D. 42**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                    Plaintiff and Appellee,

    v.

JOHN GRAHAM A/K/A
JOHN BOY PATTON,                          Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JOHN J. DELANEY
Retired Circuit Judge

* * * *

MARTY J. JACKLEY
Attorney General

MAX A. GORS
Assistant Attorney General
Pierre, South Dakota                      Attorneys for plaintiff and
                                                          appellee.


JOHN R. MURPHY
Rapid City, South Dakota                  Attorney for defendant and
                                                          appellant.

* * * *

ARGUED ON MARCH 19, 2012

OPINION FILED **05/30/12**

#25899

ZINTER, Justice

[¶1.] John Graham was convicted of felony murder. He appeals, contending that: he was tried on the felony murder charge in violation of the specialty doctrine of federal extradition law; the circuit court erred in admitting hearsay; there was insufficient evidence to support the conviction; and, his life sentence without parole was unauthorized by statute and was unconstitutional under the Eighth Amendment. We affirm.

*Facts and Procedural History*

[¶2.] In February 1976, Anna Mae Aquash's body was found at the bottom of a bluff in a remote area of the Badlands near Highway 73 between Kadoka and Wanblee. An autopsy indicated that she died from a single bullet wound to the head.

[¶3.] In 2003, John Graham, a Canadian citizen, was charged in federal court with the premeditated murder of Aquash. In 2007, Graham was extradited to the United States from Canada on that charge. After protracted litigation in the federal courts, the federal premeditated murder charge was dismissed. *See United States v. Graham*, 572 F.3d 954 (8th Cir. 2009). However, before Graham could return to Canada, he was indicted by a Pennington County grand jury on state charges of premeditated murder and felony murder.[1] The underlying felony was alleged to be the kidnapping of Aquash.

---

1. SDCL 22-16-9 (1975) provided: "Homicide is murder when perpetrated without any design to effect death by a person engaged in the commission of any felony."

-1-

[¶4.]     The State's theory of the case was that Aquash was kidnapped and murdered because leaders and members of the American Indian Movement (AIM) believed she was a federal government informant.  In the 1970s, Aquash had been actively involved in AIM.  In the summer of 1975, Aquash was arrested with several AIM leaders on federal charges involving the possession of explosives on the Rosebud Sioux Indian Reservation.  Aquash was charged in federal court and released from custody.  In October 1975, Aquash, along with other AIM members and leaders, traveled to Washington in a motor home.  After spending some time in Washington, the group traveled to Oregon.  While traveling in Oregon in November, the occupants of the motor home were involved in a shoot-out with the Oregon Highway Patrol.  Aquash was arrested on additional charges and was returned to South Dakota to face the prior federal charges.  Aquash was released again on the South Dakota federal charges, and she fled to Denver around November 25, 1975.

[¶5.]     The State presented evidence that a few days after Aquash arrived in Denver, AIM leaders ordered Aquash to be taken to Rapid City to face the allegation that she was an informant for the government.  Witnesses testified that Aquash's hands were tied, and she was forcibly taken to Rapid City by AIM members Graham, Arlo Looking Cloud, and Theda Clarke.  There was also evidence that this group eventually obtained a gun, took Aquash to a bluff in the Badlands, and Graham shot her.

[¶6.]     Over defense objections, the State introduced out-of-court statements to prove its theory of the case.  The circuit court allowed Looking Cloud and Denise Maloney (Aquash's daughter) to testify to the contents of a telephone call Looking

Cloud made to Maloney in 2002 regarding the shooting. Looking Cloud testified he "told [Maloney] that John Boy [Graham] shot [Aquash] and there was Theda [Clarke] and I, and I was sorry." Maloney confirmed Looking Cloud's call. Maloney testified that during the call, Looking Cloud told her "that [Looking Cloud] was told to stay at the car. And that John Boy [Graham] and Theda and [Aquash] went up over a hill. [Looking Cloud] heard a gunshot. And John Boy [Graham] and Theda came back without [Aquash]."

[¶7.]     The State also introduced out-of-court statements through Troy Lynn Yellow Wood relating to Aquash's status as an informant and AIM leaders' motivation to kill her. The statements were made in a 1975 encounter in Farmington, New Mexico between Aquash and AIM leader Leonard Peltier. Yellow Wood testified that Aquash told Yellow Wood that during that meeting, Peltier held a gun to Aquash's head while Peltier made statements accusing Aquash of being an informant.[2]

---

2.     Yellow Wood testified:

> [Aquash] said that people were—it seems like there was some kind of—a little—a meeting of certain people that were accusing her of being an informant. And that—and she had to defend herself. And she told me that—that Leonard Peltier was there and that he said, you know, I want to hear it from the horse's mouth, Anna Mae. I want to know if you are doing what they are saying that you are doing. Are you giving us up? Are you doing this?
>
> And she said that she just—she said she was really afraid because he had a gun and she said he held the gun to her head and she told him if you believe that about me, then pull the trigger. But either you defend me or you kill me because I am

(continued . . .)

[¶8.]     The last out-of-court statements at issue were introduced through Darlene "Kamook" Nichols Ecoffey.  The statements related to AIM leaders' motivation to have Aquash killed.  Ecoffey was in the motor home with Peltier and Aquash when they traveled to Washington in October 1975.  Ecoffey indicated that during that trip, Peltier made a self-incriminatory statement in the presence of Aquash.  Ecoffey testified that Peltier bragged to the occupants of the motor home that he had shot and killed an FBI agent on the Pine Ridge Indian Reservation while the agent was begging for his life.[3]

_____

(. . . continued)

> tired of everybody doing this to me.  I am tired of being the target of your—all this nonsense.  I am not guilty.

3.     Kamook Ecoffey testified:

> Q:   Who, again, was present for the discussion involving Leonard Peltier?
> A:   It would be myself, Dennis Banks, Kenny Loud Hawk, my sister Bernie Nichols, and Annie Mae [Aquash], and Leonard [Peltier].
> Q:   Did you witness or did you see—did you witness and see Leonard Peltier make what appears to be incriminating statements?
> A:   Yes, I did.
> Q:   Would you please look to the jury and to the best that you can[,] describe what he said and any hand movements he said [sic] when he made it?
> A:   He held his hand like this (indicating).  He was standing— there was a little table.  We were sitting at the table.  He was standing by the table in the motor home.  He held his hand like this (indicating) and he said, that mother f***** was begging for his life but I shot him anyway.
> Q:   Kamook, who was he referring to?
> A:   He was talking about the FBI agent.

[¶9.]        Graham was found guilty of felony murder, but was acquitted of premeditated murder.  He was sentenced to life in prison without parole.  Graham raises the following issues on appeal:

1.    Whether the doctrine of specialty, arising under an extradition treaty with Canada, deprived the State of jurisdiction to try Graham on the state felony murder charge when he had been extradited to the United States on the federal charge of premeditated murder.

2.    Whether the circuit court erred in allowing Looking Cloud's and Maloney's testimony restating Looking Cloud's 2002 telephonic statement to Maloney.

3.    Whether the circuit court erred in allowing Yellow Wood's testimony that Aquash said that Peltier made a statement accusing Aquash of being an informant.

4.    Whether the circuit court erred in allowing Ecoffey's testimony that Peltier, in the presence of Aquash, made a self-incriminatory statement admitting that he killed an FBI agent.

5.    Whether there was sufficient evidence to convict Graham of felony murder.

6.    Whether Graham's sentence of life imprisonment without parole was authorized by statute, and whether the sentence was cruel and unusual punishment under the Eighth Amendment.

*Decision*

*Specialty*

[¶10.]        Because Graham was extradited from Canada on the federal premeditated murder charge, he argues that under the doctrine of specialty, the State lacked personal jurisdiction to prosecute him on the State felony murder charge.  *See Johnson v. Browne*, 205 U.S. 309, 27 S. Ct. 539, 51 L. Ed. 816 (1907) (discharging a defendant from imprisonment for an offense different than the

offense for which Canada had granted extradition); *see also* Treaty on Extradition

Between the Government of Canada and the Government of the United States

(Treaty), U.S.-Can., art. 12, Dec. 3, 1971, 27 U.S.T. 983 (providing that an

extradited person "shall not be detained, tried or punished in the territory of the

requesting State for an offense other than that for which extradition has been

granted").  Graham argues that because he was not extradited on the felony murder

charge, his conviction should be vacated and he should be allowed to return to

Canada to challenge extradition on that charge.[4]  The State responds that any

---

4.    The circuit court concluded that because Graham was physically present
      before the court, the means used to acquire his presence were irrelevant.
      This reasoning is incorrect in cases where physical presence has been
      obtained by means of an extradition proceeding under a treaty.  The Eleventh
      Circuit Court of Appeals explained:

> The Supreme Court first recognized the doctrine of specialty in
> *United States v. Rauscher,* 119 U.S. 407, 7 S. Ct. 234, 30 L. Ed.
> 425 (1886). . . .  The Court held that because Rauscher had been
> brought within the jurisdiction of the court under an extradition
> treaty, he could only be tried for one of the offenses described in
> the treaty and for the offense with which he had been charged in
> the extradition proceeding.  *Rauscher,* 119 U.S. at 430, 7 S. Ct.
> at 246.
> . . .
> [However, one must also consider] *Ker v. Illinois,* 119 U.S. 436, 7
> S. Ct. 225, 30 L. Ed. 421 (1886), a companion case to *Rauscher.*
> Law enforcement officers kidnapped Ker in Peru and forcibly
> brought him to the United States to face a state court charge of
> larceny.  He argued that his kidnapping violated the provisions
> of the United States–Peru extradition treaty.  The Court
> rejected Ker's claim on the grounds that the extradition treaty
> was inapplicable because Ker had been abducted rather than
> extradited.  119 U.S. at 442, 7 S. Ct. at 228-29.  The Court
> distinguished *Rauscher* on the grounds that Rauscher "came to
> this country clothed with a protection which the nature of such
> [extradition] proceedings and a true construction of the treaty
> gave him."  *Ker,* 119 U.S. at 443, 7 S. Ct. at 229.  When read

(continued . . .)

objection based on the doctrine of specialty was waived by Canada.[5] Violations of the doctrine of specialty implicate personal jurisdiction, and "challenges to personal jurisdiction based on the alleged violation of an extradition treaty between the United States and another country" are reviewed de novo. *United States v. Anderson*, 472 F.3d 662, 666, 668 (9th Cir. 2006).

[¶11.] "The rule of specialty 'stands for the proposition that the requesting state, which secures the surrender of a person, can prosecute that person only for the offense for which he or she was surrendered by the requested state or else must allow that person an opportunity to leave the prosecuting state to which he or she had been surrendered.'" *United States v. Valencia-Trujillo*, 573 F.3d 1171, 1173-74 (11th Cir. 2009) (quoting *United States v. Gallo-Chamorro*, 48 F.3d 502, 504 (11th Cir. 1995)). It is, however, also generally recognized that a defendant is not

---

(. . . continued)

> together, *Ker* and *Rauscher* establish that when personal jurisdiction over a criminal defendant is obtained through extradition proceedings, the defendant may invoke the provisions of the relevant extradition treaty in order to challenge the court's exercise of personal jurisdiction.

*United States v. Puentes*, 50 F.3d 1567, 1572-73 (11th Cir. 1995).

5. The State also contends that Graham was in state court for felony murder based upon the same facts supporting the federal court charges for which he was extradited. *See United States v. Sensi*, 879 F.2d 888, 895-96 (D.C. Cir. 1989) ("What the doctrine of specialty requires is that the prosecution be 'based on the same facts as those set forth in the request for extradition.'" (quoting Restatement (Third) of Foreign Relations Law of the United States § 477 cmt. a (1987))). In addition, the State asserts that the treaty contains no language allowing Graham to return to Canada to contest extradition. In light of our decision on waiver, we do not review these contentions.

protected by the doctrine of specialty if the extraditing country waives objection to prosecution for a crime other than one for which the defendant was extradited.

> There is a recognized limitation . . . on a defendant's right to object on the ground that his extradition has violated the doctrine of specialty. He may not raise such a claim if the state from which he is extradited explicitly waives any objection based on the rule of specialty. Such a waiver abrogates that portion of the treaty with respect to the defendant.

*Antwi v. United States*, 349 F. Supp. 2d 663, 671 (S.D.N.Y. 2004); *United States v. Thirion*, 813 F.2d 146, 151 (8th Cir. 1987) (recognizing that the doctrine of specialty is waived if the asylum country consents to extradite the defendant for another offense).

[¶12.] In this case, Canada explicitly consented to the prosecution of Graham on the Pennington County indictment charging felony murder.[6] Because Canada

---

6. The Consent to Waiver of Specialty, signed by the Canadian Minister of Justice on February 2, 2010, provides:

> Consent to Waiver of Specialty Article 12(1)(iii) of the *Treaty on Extradition between Canada and the United States of America*
>
> *United States of America v. John Graham*
>
> Having regard to the request from the United States of America dated December 18, 2009, (Diplomatic Note No. 852) and to the provisions of sub-paragraph 12(1)(iii) of the *Treaty on Extradition between Canada and the United States of America*, I hereby consent to the detention, prosecution and, if he is convicted, punishment of John Graham with respect to the offences which are set forth in the Indictment, No. 09-3953, filed on September 9, 2009, in the Seventh Circuit Court, County of Pennington, namely:
>
> Count 1: Murder while in the Commission of any felony namely kidnapping, in violation of South Dakota Codified Law 22-16-9 and 22-19-1; and

(continued . . .)

consented to waive specialty with respect to the state charge at issue, the State had jurisdiction to prosecute Graham for felony murder.[7]

[¶13.] Graham, however, also argues that this case should be remanded to provide him with an opportunity to challenge the validity of Canada's written consent, which he was not allowed to examine before trial. The State argues that Graham has no standing to assert a violation of the doctrine of specialty under the Treaty.

[¶14.] The federal circuits are divided on the "question of whether a criminal defendant has standing to assert a violation of the doctrine of specialty." *United States v. Puentes*, 50 F.3d 1567, 1572 (11th Cir. 1995).[8] But even the courts that

---

(. . . continued)

>Count 3: Premeditated Murder, in violation of South Dakota
>Codified Law 22-16-4.

7. Graham's reliance on *Browne* is misplaced. In *Browne*, 205 U.S. at 311-17, 321, 27 S. Ct. at 539-41, 543, the Canadian government consented to extradition for one offense. But when the defendant was extradited to New York, the government imprisoned the defendant on a prior conviction of an offense for which the Canadian government had specifically refused to grant extradition. Unlike in *Browne*, the Canadian government consented to Graham's prosecution for the specific felony murder charge at issue.

8. Some circuits have concluded that "individuals have no standing to challenge violations of international treaties in the absence of a protest by the sovereigns involved." *Matta-Ballesteros v. Henman*, 896 F.2d 255, 259 (7th Cir. 1990); *accord United States v. Burke*, 425 F.3d 400, 408 (7th Cir. 2005) ("[E]xtradition treaties do not create personal rights enforceable by criminal defendants."); *United States ex rel. Saroop v. Garcia*, 109 F.3d 165, 168 (3d Cir. 1997) ("Had [defendant] brought suit invoking the treaty or the Rule of Specialty, she would lack standing."); *United States v. Riviere*, 924 F.2d 1289, 1296-1301 (3d Cir. 1991) (holding that defendant lacked standing to assert that extradition violated extradition treaty because treaty ran between sovereign nations, not individuals, and because expediting nation consented

(continued . . .)

recognize a defendant's standing to assert a sovereign's right to specialty, impose limits on that individual's standing: "The extradited individual . . . enjoys this right [to challenge extradition] at the sufferance of the requested nation. As a sovereign, the requested nation may waive its right to object to a treaty violation and thereby deny the defendant standing to object to such an action." *Id.* at 1575. Further, when there is no suggestion of an objection by the asylum country, a court may reject a defendant's challenge to the validity of a specialty waiver. *See United States v. Najohn*, 785 F.2d 1420, 1423 (9th Cir. 1986) (noting that although the defendant challenged the documents permitting prosecution, in "view of the absence of any effort by the defendant to obtain a Swiss judgment prohibiting Swiss consent to further prosecution, we are justified in regarding the statement of the executive

---

(. . . continued)

to extradition); *United States v. Kaufman*, 874 F.2d 242, 243 (5th Cir. 1989) (per curiam) (stating that only the offended nation that is a party to a treaty may complain of a breach of the treaty); *Demjanjuk v. Petrovsky*, 776 F.2d 571, 583-84 (6th Cir. 1985) (expressing doubt that the individual has standing on the grounds that "[t]he right to insist on application of the principle of specialty belongs to the requested state, not to the individual whose extradition is requested"); *United States v. Cordero*, 668 F.2d 32, 38 (1st Cir. 1981) ("[U]nder international law, it is the contracting foreign government, not the defendant, that would have the right to complain about a violation [of an extradition treaty].").

Other circuits have concluded that even when an extraditing country does not specifically object to prosecution, "an individual extradited pursuant to an extradition treaty has standing under the doctrine of specialty to raise any objections which the requested nation might have asserted." *Puentes*, 50 F.3d at 1575; *accord United States v. Andonian*, 29 F.3d 1432 (9th Cir. 1994) ("An extradited person may raise whatever objections the extraditing country is entitled to raise."); *United States v. Levy*, 905 F.2d 326, 328 n.1 (10th Cir. 1990) (stating that a defendant has standing to assert a violation of the doctrine of specialty); *Thirion*, 813 F.2d at 151 n.5 (allowing an extradited defendant to bring any objections the extraditing country might have raised).

-10-

branch as the last word of the Swiss government" regarding consent.). The Ninth Circuit reasoned: "To do otherwise would ignore the precept that courts do not intervene in foreign affairs. . . . [T]here is no reason to extend [the doctrine of specialty] to require courts to initiate an investigation into the workings of foreign governments." *Id.*; *see also United States v. Tse*, 135 F.3d 200, 205 (1st Cir. 1998) (rejecting a defendant's challenge to the validity of the extraditing government's letter waiving the rule of specialty, stating: "Despite [the defendant]'s assertions[,] the note appears to be an official response from the [extraditing] government, and this court has no power to require [the extraditing government] to follow a particular procedure in granting a diplomatic request.").

[¶15.] Here, under either view of standing, Graham's request for a remand to consider a possible challenge to the validity of Canada's written consent is not authorized. Graham has not argued that Canada did or would object to Graham's prosecution for felony murder. On the contrary, the only record evidence reflects Canada's express consent to the prosecution. Further, under either view of standing, Graham may not challenge Canada's *decision* to consent. Finally, Graham has had access to the written consent in preparing this appeal but does not argue that it is a misrepresentation or forgery.[9] And without some basis for

---

9. At a pre-trial hearing, Graham requested discovery of Canada's consent to waiver of specialty. An Assistant United States Attorney was present. It was acknowledged by all present that the United States Attorney's Office had represented that Canada had consented to the state prosecution. Graham, however, indicated that he had been in contact with the Canadian Consulate and was having difficulty obtaining information. Graham argued that if the United States Government's representation were untrue, the misrepresentation would constitute prosecutorial misconduct implicating

(continued . . .)

believing that Canada had not consented, even those courts recognizing individual standing would not grant Graham's request for a remand simply to explore a challenge to Canada's written waiver.

*Admissibility of Looking Cloud's and Maloney's Testimony Restating Looking Cloud's 2002 Telephonic Statement to Maloney*

[¶16.]     Graham argues that Looking Cloud's and Maloney's testimony restating Looking Cloud's 2002 statement in his telephone call to Maloney was inadmissible hearsay. The State argues that Looking Cloud's 2002 telephone statement to Maloney was a prior consistent statement under SDCL 19-16-2 (Rule 801(d)(1)). Graham responds that the State failed to establish the foundation for a prior consistent statement. We review the circuit court's evidentiary ruling under the abuse of discretion standard. *State v. Fisher*, 2011 S.D. 74, ¶ 32, 805 N.W.2d 571, 578.

[¶17.]     "'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter

---

(. . . continued)

Graham's right to due process. It was subsequently ordered that the Assistant United States Attorney would determine if the consent was a public document, and if so, it would be disclosed. In response to that order, the State and United States Attorney disclosed that the consent was not a public document, but that Canada agreed to an *in camera* inspection by the circuit court and the circuit court could determine "the value or relevance of [the consent] to the defense." The circuit court conducted an *in camera* review of a copy of Canada's consent and sealed the document, indicating that good cause had not been shown for disclosure. On motion by Graham, the formal written Consent to Waiver of Specialty was unsealed and disclosed to Graham after trial. Graham does not appeal the circuit court's decision sealing the Consent to Waiver of Specialty.

asserted." SDCL 19-16-1(3) (Rule 801(c)). Certain prior consistent statements are not hearsay.

> A statement is not hearsay if the declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
> . . .
> (2) Consistent with his testimony and is offered to rebut an express or implied charge against him of recent fabrication or improper influence or motive . . . .

SDCL 19-16-2(2) (Rule 801(d)(1)).

[¶18.] Looking Cloud was the declarant whose out-of-court statement was repeated by both Looking Cloud and Maloney at trial. Graham argues that Looking Cloud's statement was not a prior "consistent" statement because it was inconsistent with his trial testimony. Graham also argues that because the testimony was given before Looking Cloud was impeached, there was no express or implied charge of recent fabrication. The State responds that the material part of Looking Cloud's out-of-court statement—that Graham shot Aquash—was consistent with his trial testimony. The State also contends that Graham raised the charge of recent fabrication by making that assertion in his opening statement. We agree with the State's contentions.

[¶19.] Looking Cloud was the principal witness against Graham. In Graham's opening statement, Graham's counsel charged Looking Cloud with recent fabrication of his story regarding Graham's involvement in the kidnapping and murder. Although Graham's counsel did not specifically reference the details of the shooting, he claimed that Looking Cloud "change[d] his story in every material way" as the result of negotiations with the government to obtain a reduced sentence in 2008. Graham argued that "Looking Cloud showed that he would be willing to do

anything to help [the government] in any prosecution," and that Looking Cloud had "bias and motives to lie . . . and all sorts of other reasons for slanting [his] testimony." Graham asked the jury "to consider whether Arlo Looking Cloud . . . respect[s] the oath or whether [he is] testifying based on other reasons." Graham clearly claimed that Looking Cloud had recently fabricated his expected testimony.[10] With respect to consistency, some details of Looking Cloud's prior 2002 statement to Maloney were inconsistent with his trial testimony. But the essence of Looking Cloud's 2002 out-of-court statement—that Graham shot Aquash—remained consistent with Looking Cloud's trial testimony. Therefore, Looking Cloud's 2002 statement to Maloney was a prior consistent statement that was properly admitted to rebut Graham's charge of recent fabrication.[11]

---

10. Graham argues that Looking Cloud's 2002 statement does not predate his motive to lie because Looking Cloud brokered his first "deal" with the government in 1994. *See State v. Younger*, 453 N.W.2d 834, 839 (S.D. 1990) ("[T]he proponent must demonstrate that the prior consistent statement was made prior to the time the supposed motive to falsify arose."). However, it is clear from Graham's opening statement that Graham was alleging fabrication in 2008. In his opening statement, Graham claimed: "So Arlo Looking Cloud, when he starts that [sic] negotiations for the Rule 35 [sentence reduction, which started in 2008], suddenly changes his story in every material way."

11. Graham also waived his objection to Maloney's testimony regarding Looking Cloud's statement. Although Graham objected the first time Maloney was asked to testify about Looking Cloud's statement, the court did not issue a definitive ruling that the testimony was a prior consistent statement. Therefore, Graham was required to renew the objection when Maloney was asked that question again. *See* SDCL 19-9-3 (Rule 103(a)).

*Admissibility of Yellow Wood's Testimony that Aquash Stated that Peltier Held a Gun to Aquash's Head While Accusing Her of Being an Informant*

[¶20.]     Graham filed a motion in limine to preclude Yellow Wood from testifying that Aquash told Yellow Wood that Peltier, while holding a gun to Aquash's head, accused Aquash of being an informant.  The circuit court denied Graham's motion.  The court concluded that the evidence was not hearsay because: (1) Peltier's "threat [was] relevant to one of the proffered motives for Aquash's murder—that she was widely suspected to be an informant by members of the American Indian Movement, including Peltier"; (2) the State's theory was that Aquash was murdered on orders of AIM leaders, and Graham was a member of AIM; and, (3) "the truth of the matter asserted—that Aquash was or was not an informant—[was] not the purpose of [admitting] the statements' introduction . . . ."

[¶21.]     On appeal, the State adopts the circuit court's reasoning, pointing out that an out-of-court statement is not hearsay unless it is "offered in evidence to prove the truth of the matter asserted."  *See* SDCL 19-16-1(3) (Rule 801(c)).  Graham, however, points out that even if Peltier's accusation was admissible for some permissible purpose other than proving the truth of the matter asserted, Yellow Wood was testifying to prove the truth of Aquash's out-of-court statement that Peltier made the accusation.  Therefore, Graham argues that Yellow Wood's repetition of Aquash's out-of-court statement about Peltier's out-of-court statement was inadmissible hearsay within hearsay.  We agree with Graham.

[¶22.]     Yellow Wood's testimony was hearsay within hearsay.  Her testimony included both Peltier's out-of-court statement to Aquash and Aquash's out-of-court statement to Yellow Wood.  When hearsay within hearsay is offered, SDCL 19-16-36

(Rule 805) requires that each statement either meet a hearsay exception or qualify as "nonhearsay." *See Johnson v. O'Farrell*, 2010 S.D. 68, ¶ 16, 787 N.W.2d 307, 313; *see also* 5 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Federal Evidence* § 805.04 (Joseph M. McLaughlin ed., Matthew Bender 2d ed. 2011) ("Hearsay within hearsay is . . . wholly inadmissible when any single out-of-court statement fails to qualify under an exclusion from or exception to the hearsay rule.").

[¶23.] We acknowledge the State's point that Peltier's accusatory statement regarding Aquash's status as an informant was not hearsay if offered by a witness to the statement to prove that there were rumors in the AIM community that Aquash was a suspected informant. *See United States v. Looking Cloud*, 419 F.3d 781, 787-88, 789 n.5 (8th Cir. 2005) (allowing informant rumor testimony by AIM members who had apparently been witnesses to the rumors regarding Aquash). But Yellow Wood was not a witness to Peltier's statement, and her recitation of Aquash's statement does not meet a hearsay exception or exclusion. On the contrary, Yellow Wood's testimony was offered to prove the truth of Aquash's statement—that Peltier actually put a gun to Aquash's head while accusing her of being an informant. Because Yellow Wood's testimony was being offered to prove the truth of Aquash's statement, Yellow Wood's testimony was inadmissible hearsay. *See United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504 (5th Cir. 2008) (immigration agent's affidavit stating that police officers' statements to agent regarding defendant's admissions to officers was based on hearsay because the agent was not present when defendant made admissions to the officers); *Haywood v.*

*Lucent Techs., Inc.*, 323 F.3d 524, 533 (7th Cir. 2003) (plaintiff's testimony that former co-worker told her that her superiors had said plaintiff was unstable was inadmissible hearsay).

[¶24.]     *Looking Cloud*, 419 F.3d 781, does not support the State's position that Aquash's statement to Yellow Wood was not hearsay.  The specific statements considered in *Looking Cloud* are not disclosed, but they appear to involve witnesses who had firsthand knowledge of rumors of Aquash being an informant.  In any event, the *Looking Cloud* court did not consider whether hearsay within hearsay could be used to prove that a particular individual made a particular statement accusing Aquash of being an informant in the presence of other AIM members.  Because Yellow Wood's testimony was being offered to prove the truth of Aquash's statement, Aquash's credibility was at issue, and Aquash's statement was not excluded from the definition of hearsay.  *See* SDCL 19-16-1(3) (Rule 801(c)).  The circuit court erred in admitting Yellow Wood's testimony repeating what Aquash said Peltier said to Aquash.

[¶25.]     The error, however, does not end the inquiry.  "Even if a trial court's evidentiary ruling is erroneous, the error must be prejudicial in nature before we will overturn the ruling."  *Fisher*, 2011 S.D. 74, ¶ 32, 805 N.W.2d at 578.  "Error is prejudicial when, in all probability . . . it produced some effect upon the final result and affected rights of the party assigning it."  *Id.* (alteration in original).  "In determining whether an error is harmless, the reviewing court must take account of what the error meant to [the jury], not singled out and standing alone, but in

relation to all else that happened." *State v. Johnson,* 2009 S.D. 67, ¶ 25, 771 N.W.2d 360, 370 (alteration in original).

[¶26.] In this case, numerous witnesses other than Yellow Wood testified that Aquash was rumored to be a government informant in the AIM community. For example, Kamook Ecoffey testified that Aquash was a suspected informant, and Ecoffey believed that Aquash was brought on the motor home trip with AIM leaders Leonard Peltier and Dennis Banks because they wanted to "keep an eye on her." Other witnesses testified that during one of the discussions regarding Aquash being an informant, Ernesto Vigil made a "throat-slitting" gesture and said they take "snitches" out to the country and get rid of them. There was also testimony that Aquash was tied up and transported from Denver to Rapid City to answer to the informant allegations—testimony clearly showing the seriousness of the informant rumors. Because the informant rumors and related threats were pervasive and essentially undisputed throughout the trial, Yellow Wood's one similar statement could not have materially affected the verdict.

*Admissibility of Kamook Ecoffey's Testimony Relating Leonard Peltier's Admission*

[¶27.] The circuit court permitted Ecoffey to testify that Leonard Peltier, in the presence of Aquash, admitted killing an FBI agent. The court reasoned that Ecoffey's statement was not offered to prove the truth of the matter asserted: it was offered to prove that because Aquash heard Peltier make the statement, AIM leaders had a motive to kill Aquash. Graham looks at the question narrowly. Graham views the truth of the matter asserted as the truth of whether Peltier made

the admission. Graham argues that Ecoffey's statement was hearsay because it was offered to prove that Peltier actually admitted killing the FBI agent.

[¶28.]    We agree that Peltier was the declarant, and his out-of-court statement was an admission that he killed an FBI agent. But the State did not offer Ecoffey's statement to prove that Peltier had actually killed the FBI agent. The State first elicited Ecoffey's testimony placing Aquash in the presence of Peltier in the motor home. Ecoffey then testified to the nature of Peltier's admission. Thus, Ecoffey's testimony was used to prove that Aquash overheard Peltier make the highly self-incriminatory statement. When considered with the evidence that AIM members suspected that Aquash was a government informant, Ecoffey's testimony was relevant to prove the State's theory that AIM leaders and members had a motive to kill Aquash. Because Ecoffey's testimony was offered for a relevant purpose other than proving the truth of Peltier's statement, Ecoffey's testimony was not hearsay under SDCL 19-16-1(3) (Rule 801(c)).

*Sufficiency of the Evidence*

[¶29.]    Graham challenges the sufficiency of the evidence supporting the jury's verdict and the denial of his motions for judgments of acquittal. Challenges to the sufficiency of the evidence are reviewed to determine "whether there is evidence in the record which, if believed by the jury, is sufficient to sustain a finding of guilt beyond a reasonable doubt." *Johnson*, 2009 S.D. 67, ¶ 29, 771 N.W.2d at 371; *State v. Larson*, 1998 S.D. 80, ¶ 9, 582 N.W.2d 15, 17. "We must accept the most favorable inferences that can be drawn from the evidence in support of a verdict." *State v. Waugh*, 2011 S.D. 71, ¶ 24, 805 N.W.2d 480, 485. The

jury exclusively judges witness credibility and weighs evidence. Consequently, "this Court does not resolve conflicts in the evidence, or pass on the credibility of witnesses, or weigh the evidence." *Johnson*, 2009 S.D. 67, ¶ 10, 771 N.W.2d at 365. "No guilty verdict will be set aside if the evidence, including circumstantial evidence and reasonable inferences drawn therefrom, sustains a reasonable theory of guilt." *Waugh*, 2011 S.D. 71, ¶ 24, 805 N.W.2d at 486. When considering either a motion for acquittal or a sufficiency of the evidence challenge, "a reviewing court must . . . consider all the evidence the trial court had before it, including any evidence that is later determined to be inadmissible." *State v. Frazier* (*Frazier I*), 2001 S.D. 19, ¶ 45, 622 N.W.2d 246, 261.

[¶30.] To be guilty of felony murder, a defendant must have caused a death while engaged in the perpetration of an underlying felony. *State v. Rough Surface*, 440 N.W.2d 746, 759 (S.D. 1989). Graham argues that there was no evidence that Aquash's death was the result of a kidnapping or that the death occurred while the kidnapping was being committed. Graham specifically contends that there was no evidence of the events occurring between the time Graham allegedly kidnapped Aquash in Denver in late November 1975, and the time (on or around December 10 to December 12) the State alleged Aquash was killed. Graham contends that there was no evidence showing Graham had contact with or proximity to Aquash during those two weeks prior to her death. Graham contends that there was no evidence suggesting that Aquash was held in captivity from late November through mid-December 1975. Graham contends that it was uncontroverted that Aquash was seen alive on or around December 15 without Graham, and that Aquash could have

died weeks or months after December 15. Graham ultimately claims that a gap existed in the causal chain between the underlying kidnapping and the murder, rendering the jury's felony murder conviction unsustainable. We disagree.

[¶31.] Looking Cloud provided a causal connection between the kidnapping and murder of Aquash that the jury could have adopted. Looking Cloud testified that the kidnapping in Denver occurred around November 26 and ended with Aquash's death around November 28. We acknowledge Graham's point that Looking Cloud's testimony was inconsistent with Candy Hamilton's testimony that she saw Aquash alive around December 15 outside the presence of Graham, Looking Cloud, and Clarke. We also acknowledge that Looking Cloud's estimated time of death is different from other witnesses' estimates. However, we do not resolve such inconsistencies and ambiguities in reviewing a sufficiency of the evidence challenge. *See State v. Brim*, 2010 S.D. 74, ¶ 6, 789 N.W.2d 80, 83; *Johnson*, 2009 S.D. 67, ¶ 10, 771 N.W.2d at 365. Rather, "we accept the evidence and the most favorable inferences fairly drawn therefrom, which will support the verdict." *Johnson*, 2009 S.D. 67, ¶ 10, 771 N.W.2d at 365. Consequently, under our standard of review, we must accept Looking Cloud's testimony regarding the connection between the kidnapping and the murder.

[¶32.] We also note that, notwithstanding the uncertainties regarding the date of Aquash's death, there was evidence that Aquash was shot by Graham in the course of a kidnapping. Angie Janis, Yellow Wood, and George Palfy testified to the kidnapping of Aquash in Denver. In a taped interview, Graham admitted that he drove Aquash from Denver to South Dakota. Cleo Gates and Richard Marshall

established that Graham remained involved in the kidnapping from Denver to their house in Allen. Considering the extremely rural nature of this area, the jury could have determined that Aquash was killed in proximity to the Gates-Marshall house. Finally, Looking Cloud testified that Aquash was shot by Graham in the course of the kidnapping. This evidence, and the most favorable inferences that can fairly be drawn from it, were sufficient to support the verdict, including a causal connection between the kidnapping and murder.

[¶33.]     Graham, however, argues that the only witness creating the causal link was Looking Cloud. Graham points out that Looking Cloud was an accomplice as a matter of law. Graham argues that his conviction cannot be sustained because Looking Cloud's testimony was not corroborated. We disagree.

[¶34.]     SDCL 23A-22-8 requires the corroboration of an accomplice's testimony. "A conviction cannot be had upon the testimony of an accomplice unless it is corroborated by other evidence which tends to connect the defendant with the commission of the offense. The corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof." *Id.* "Evidence is sufficient to corroborate the testimony of an accomplice if it tends to 'affirm the truth of the testimony of the accomplice and establish the guilt of the accused.'" *State v. Talarico*, 2003 S.D. 41, ¶ 39, 661 N.W.2d 11, 24 (quoting *State v. Phyle*, 444 N.W.2d 380, 382 (S.D. 1989)). "[C]orroboration may be found from 'the defendant's opportunity and motive to commit the crime and his proximity to the place where the crime was committed.'" *Staunton v. State*, 784 N.W.2d 289, 299 (Minn. 2010) (quoting *State v. Adams*, 295 N.W.2d 527, 533 (Minn. 1980)); *see also State v.*

*Moellar*, 281 N.W.2d 271, 273 (S.D. 1979) (recognizing that "the association of a defendant and an accomplice in the neighborhood where the crime was committed may sufficiently connect the defendant with the crime to furnish the necessary corroboration of the accomplice").

[¶35.] Looking Cloud's testimony was corroborated by Janis, Palfy, and Yellow Wood. Janis and Palfy testified that Aquash was tied up and placed in a car by Graham and Clarke at Yellow Wood's house in Denver. Yellow Wood testified that Graham and Clarke took Aquash out of Yellow Wood's house and placed Aquash in the back of Clarke's car, while Clarke, Graham, and Looking Cloud got in the front of the car. Yellow Wood further testified that while this was happening, Aquash was crying and told Yellow Wood that "if they take me from here, you will never see me alive again."

[¶36.] Looking Cloud's testimony was also corroborated by Gates and Marshall. Gates and Marshall testified that Graham, Clarke, and Looking Cloud brought Aquash to their house in Allen around 10:30 p.m. on a fall or winter night in 1975. Gates testified that Graham, Clarke, or Looking Cloud came in and "walked [Aquash] over to a chair in the living room and sat her down." Gates testified that Marshall then went into the bedroom with Clarke, Graham, and Looking Cloud. Marshall emerged from the bedroom and asked Gates if they could keep Aquash tied up in the basement. Gates refused. Graham, Clarke, Looking Cloud, and Aquash then left, and Aquash's body was ultimately found in proximity to that residence. Thus, other witnesses corroborated Looking Cloud's testimony and Graham's opportunity, motive, and complicity in the murder.

[¶37.]     Looking Cloud's testimony was further corroborated by the physical evidence. Looking Cloud testified that Clarke obtained a "revolver" that Graham used to kill Aquash. Looking Cloud also testified that he heard only one shot, and Aquash's body went over a bluff after Graham shot her. Aquash's body was discovered at the bottom of a bluff. The physical evidence also indicated that Aquash was killed by a single bullet fired from a revolver.

[¶38.]     All of the foregoing evidence, including Graham's admission of participation in the kidnapping, corroborated Looking Cloud's testimony and Graham's participation in the crime. Janis, Palfy, and Yellow Wood confirmed Graham's kidnapping of Aquash in Denver. Graham, when confronted about the kidnapping and death admitted, "[O]kay, okay. I was there. I drove the car. I helped take her back to Rapid City." Gates and Marshall confirmed that the kidnapping continued to their home, which further confirmed Looking Cloud's timeline. Their testimony also placed Graham in proximity to the location where Aquash's body was ultimately discovered, the place where Looking Cloud testified that Graham shot Aquash.

[¶39.]     "[T]here is no requirement that every material fact testified to by the accomplice be corroborated." *State v. Olhausen*, 1998 S.D. 120, ¶ 10, 587 N.W.2d 715, 718. "Whether evidence corroborates an accomplice's version of the facts is a question for the jury." *Id.* The jury chose to believe the State's evidence and found Graham guilty of felony murder. The evidence was sufficient to sustain a finding of guilt beyond a reasonable doubt.

*Life Sentence Without Parole*

[¶40.]     Graham argues that he was not subject to a life sentence without parole because, in 1975, there was no statutory sentence of life without parole. Graham contends that under SDCL 24-15-3 (1975), parole was required to be set for all inmates. We review this question of statutory interpretation de novo. *Kendall v. John Morrell & Co.*, 2012 S.D. 13, ¶ 7, 809 N.W.2d 851, 854.

[¶41.]     Graham's statutory argument was decided in *Brim v. South Dakota Board of Pardons & Paroles*, 1997 S.D. 48, 563 N.W.2d 812. "[W]hile South Dakota did at one time statutorily allow for parole of persons sentenced to life imprisonment, this opportunity existed only for persons sentenced prior to July 1, 1913." *Id.* ¶ 5. Because Graham was not sentenced within that time period, parole was not statutorily authorized on his life sentence. *See id.* ¶¶ 5, 22.

[¶42.]     Graham also argues that his sentence amounted to cruel and unusual punishment under the Eighth Amendment because he was acquitted of premeditated murder, yet he was given the most severe punishment available in 1975. Graham's constitutional challenge requires us to review his sentence for gross disproportionality. *See State v. Larsen-Smith*, 2011 S.D. 93, ¶ 6, 807 N.W.2d 817, 819.

[¶43.]     A life sentence for felony murder, based upon a defendant's underlying felony of kidnapping and actions which "made the murder possible," is not grossly disproportionate as a matter of law. *State v. Frazier* (*Frazier II*), 2002 S.D. 66, ¶ 24, 646 N.W.2d 744, 752. Like the case in *Frazier II*, Graham made Aquash's murder possible, and he "may even have actively participated in its perpetration." *See id.* Indeed, the evidence reflects that Graham was involved in Aquash's initial

kidnapping, in ensuring that she was kept in captivity, in transporting her to her place of death, and in the ultimate shooting. Graham's sentence was not grossly disproportionate.

[¶44.] Graham finally argues that the holding in *Enmund v. Florida*, should be extended to sentences of life without parole. 458 U.S. 782, 798, 102 S. Ct. 3368, 3377, 73 L. Ed. 2d 1140 (1982) (prohibiting the death penalty for felony murder when the defendant did not take life, attempt to take life, or intend to take life). We need not consider whether *Enmund* should be extended to life sentences because in this case the evidence reflects that Graham took Aquash's life. We acknowledge Graham's point that he was acquitted of premeditated murder. But we reject Graham's inference that the jury's acquittal must be taken to mean that Graham did not participate in killing Aquash. Nothing can be inferred from Graham's acquittal on the premeditated murder charge because the jury may have disposed of that charge through leniency. *See State v. Mulligan*, 2007 S.D. 67, ¶ 11, 736 N.W.2d 808, 814 (explaining that innocence of one related homicide charge cannot be inferred from an acquittal of another charge because, when there is an acquittal on one of two interrelated charges, "the jury may have disposed of the inconsistent charge through leniency").

[¶45.] Affirmed.

[¶46.] GILBERTSON, Chief Justice, and KONENKAMP, SEVERSON, and WILBUR, Justices, concur.