26318-aff in pt, rev in pt & rem-DG
**2013 S.D. 1**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

STATE OF SOUTH DAKOTA,                           Plaintiff and Appellee,

    v.

RODNEY SCOTT BERGET,                           Defendant and Appellant.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE BRADLEY G. ZELL
Judge

* * * *

MARTY J. JACKLEY
Attorney General

PAUL S. SWEDLUND
TIMOTHY J. BARNAUD
Assistant Attorneys General
Pierre, South Dakota                           Attorneys for plaintiff
                                    and appellee.

JEFF LARSON
Sioux Falls, South Dakota

and

CASSANDRA McKEOWN
Sioux Falls, South Dakota

and

CHERI SCHARFFENBERG of
Olson, Waltner & Scharffenberg, LLP
Tea, South Dakota                           Attorneys for defendant
                                    and appellant.

* * * *

ARGUED OCTOBER 1, 2012
OPINION FILED **01/02/13**

#26318

GILBERTSON, Chief Justice

[¶1.]        Rodney Berget pleaded guilty to the first-degree murder of Ronald

Johnson.  Berget waived his right to a jury determination of the appropriate

sentence.  After a pre-sentence hearing, the circuit court sentenced Berget to death.

He appeals the imposition of the death penalty.  Pursuant to statute, this Court

consolidates those issues raised by Berget with the statutory determinations

required by SDCL 23A-27A-12.  *See* SDCL 23A-27A-10.

FACTS

[¶2.]        Berget was convicted of attempted first-degree murder in Lawrence

County in 2003, for events that occurred in June of that year.  In connection with

the same events, he was also convicted in Meade County of kidnapping.  He

received a life sentence for each conviction.  As a result, Berget has been confined to

the South Dakota State Penitentiary since December 2003.

[¶3.]        Ronald Johnson worked as a correctional officer at the South Dakota

State Penitentiary for over 23 years.  On the morning of April 12, 2011, Johnson

was working in the Pheasantland Industries building located within the walls of the

penitentiary.[1]  That same day, Berget and Eric Robert, another inmate, attempted

to escape from the penitentiary.  According to Berget's sworn testimony from the

change of plea hearing, he had been planning this escape since the previous August.

Per their plan, in order to effectuate the escape, Berget and Robert needed the

uniform of a correctional officer.  The pair entered the Pheasantland Industries

building in search of a uniformed guard and found Johnson present.

---

1.    Pheasantland Industries is a prison-industry business located within the
      walls of the penitentiary.

[¶4.] At the change of plea hearing, Berget provided the following factual basis:

> About August of last year, I came up with a way to try to get out of the penitentiary, but I needed to get a guard's uniform. So on the 11th of April, I went over to the shop and was going to try to get a uniform, but there was too many people around. So on the 12th of April, I went over to the laundry where I had a pipe and grabbed this pipe and went down to the shop.
>
> When I got down to the shop, I waited around the corner until Officer Johnson came out of the office. And when I seen him come out of the office, I waited until he got in the back of the shop. I came as fast as I could without making any noise, and I started hitting him in the head with my pipe until he went down and he wasn't moving any longer.

Later, when specifically asked about his intent in hitting Johnson with the pipe, Berget replied: "To end his life." The attack fractured Johnson's skull in at least three places. Defense-type injuries were present on Johnson's hands and arms.

[¶5.] After Berget beat Johnson with the pipe, he and Robert wrapped his head in plastic wrap. Robert then donned Johnson's uniform and Berget climbed into a box placed on a cart. Robert pushed the cart out of the Pheasantland Industries building toward the west gate of the penitentiary. At the gate, correctional officer Jodi Hall noticed that Robert did not swipe an identification badge. She confronted Robert regarding the whereabouts of his badge. When Robert's explanation did not satisfy her, she asked him to identify himself. He responded that he was "Freeburg." Still not satisfied, she contacted Corporal Matt Freeburg, a correctional officer also on duty at the gate. Freeburg instructed Hall to call the officer in charge. Presumably realizing that their plot had been discovered, Berget jumped from the box, and he and Robert began assaulting Freeburg. When

Hall observed Berget and Robert assaulting Freeburg, she called a "Code Red – Code Three." Quickly surrounded by responding correctional officers, Berget and Robert surrendered.

[¶6.] Recognizing that Robert was wearing a correctional officer's uniform, penitentiary staff searched the premises. They found Johnson in the Pheasantland Industries building and observed that he had been severely beaten and plastic wrap had been completely wrapped around his head. The officers that found him removed the plastic wrap and began CPR. Lifesaving efforts by the correctional officers, as well as those by responding medical personnel, proved futile.

[¶7.] Berget was indicted on charges of first-degree murder, felony murder, and simple assault on April 26, 2011. On November 17, 2011, against advice of counsel, Berget entered a plea of guilty to the first-degree murder charge. After carefully canvassing Berget and his attorney, the circuit court found that the plea was entered voluntarily, intelligently, and knowingly. Based on the submission to the circuit court of a psychiatric evaluation, as well as counsel's opinion as to Berget's competency, the circuit court determined Berget competent to proceed.[2]

---

2.      In *State v. Robert*, this Court inquired into the competency of the defendant sua sponte. 2012 S.D. 60, ¶ 14, 820 N.W.2d 136, 141-42. The distinction between the present situation and that presented in *Robert* is that, in *Robert*, the circuit court was not given an opportunity to review a psychiatric evaluation performed on Robert for the purpose of determining his competency. Here, Berget allowed the circuit court to review the evaluation. The circuit court's review of the evaluation did not raise any concerns regarding Berget's competency. Because the circuit court reviewed the evaluation, and all parties agree that Berget's competency is not an issue, this Court finds no reason to visit the issue of Berget's competency.

[¶8.]     The circuit court then advised Berget of his right to have a jury empaneled in order to determine his sentence.  Berget waived this right, electing to proceed with the court's determination of sentence.  Even after being advised and reminded that the court had previously sentenced Eric Robert to death, Berget chose to proceed with the same judge determining the sentence.

[¶9.]     Pursuant to SDCL 23A-27A-2 and 23A-27A-6, a pre-sentence hearing was conducted on January 30, 2012 through February 2, 2012.  After all evidence had been received, the court issued its ruling on February 6, 2012.  The circuit court found the existence of two of the statutory aggravating circumstances enumerated in SDCL 23A-27A-1, recited its consideration of the mitigating evidence and non-statutory aggravating factors presented at the pre-sentence hearing, and sentenced Berget to death.  Berget timely filed a notice of appeal.

[¶10.]    Berget raises several issues on appeal.  In addition, this Court is statutorily required to make certain determinations each time a sentence of death is imposed.  *See* SDCL 23A-27A-12.  We will first make the determinations required by SDCL 23A-27A-12, and then turn our attention to those issues raised by Berget.

ANALYSIS AND DECISION

[¶11.]    When a sentence of death is imposed, SDCL 23A-27A-12 requires that this Court make three determinations.  This section provides:

> With regard to the sentence, the Supreme Court shall determine:
>
> (1)     Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor; and

> (2) Whether the evidence supports the jury's or judge's finding of a statutory aggravating circumstance as enumerated in § 23A-27A-1; and
>
> (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.

*Id.*

[¶12.] **Issue 1: Whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.**

[¶13.] The circuit court assured that it would provide, in writing, all factors weighing into its consideration of the sentence. The court drafted a pre-sentence verdict fulfilling that assurance. A review of the pre-sentence verdict reveals that the circuit court, in forming its sentence, properly considered both the offense and the characteristics of Berget. Importantly, when discussing non-statutory aggravating factors, the court focused its attention on two issues: the nature of the offense and Berget's history. These are appropriate considerations in determining whether to impose the death penalty. SDCL 23A-27A-2. The record does not reflect that the sentence of death was imposed under passion, prejudice, or any other arbitrary factors.[3]

[¶14.] **Issue 2: Whether the evidence supports the judge's finding of aggravating circumstances as enumerated in SDCL 23A-27A-1.**

[¶15.] The circuit court found the existence of the aggravating circumstances from SDCL 23A-27A-1(7) and (8). The State argues that the evidence supports a

---

3. Berget insists the victim-impact evidence presented in this case improperly influenced the circuit court. For a more complete analysis of this issue, see *infra* ¶¶ 78-84.

finding of additional statutory aggravating circumstances. However, our task in this statutorily-mandated sentence review is to determine whether the evidence supports the judge's finding of a statutory aggravating circumstance. *See* SDCL 23A-27A-12. Therefore, we limit our review to those aggravating circumstances found by the circuit court.

[¶16.] Aggravating circumstance seven (SDCL 23A-27A-1(7)) requires a finding that: "The offense was committed against a law enforcement officer, employee of a corrections institution, or firefighter while engaged in the performance of such person's official duties[.]" At the pre-sentence hearing, Douglas Weber, Chief Warden for the State of South Dakota, testified that Ronald Johnson was an employee of the South Dakota State Penitentiary and was on duty as a correctional officer the morning of April 12, 2011. The evidence supports the judge's finding of the aggravating circumstance contained in SDCL 23A-27A-12(7). Berget does not dispute this.

[¶17.] Aggravating circumstance eight (SDCL 23A-27A-1(8)) requires a finding that: "The offense was committed by a person in, or who has escaped from, the lawful custody of a law enforcement officer or place of lawful confinement[.]" Warden Weber also testified, and it is not disputed, that Berget was lawfully confined to the penitentiary on April 12, 2011. The evidence supports the finding of this statutory aggravating circumstance beyond a reasonable doubt as well.

[¶18.]     **Issue 3:     Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant.**

[¶19.]     The final mandated inquiry—the proportionality of Berget's sentence—was also included by Berget as an issue on direct appeal, but will be addressed here. He argues that the sentence of death is both externally and internally disproportionate to his crime.

[¶20.]     We are required to determine whether Berget's sentence is disproportionate to the sentence imposed in "similar cases." "With regard to the sentence, the Supreme Court shall determine: . . . (3) Whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." SDCL 23A-27A-12. Those cases considered similar for purposes of this review are well-settled.

> This Court's previous decisions have acknowledged that our analysis of similar cases under SDCL 23A-27A-12(3) compares cases involving a capital sentencing proceeding, whether life imprisonment or a death sentence was imposed. "Because the aim of proportionality review is to ascertain what other capital sentencing authorities have done with similar capital murder offenses, the only cases that could be deemed similar are those in which imposition of the death penalty was properly before the sentencing authority for determination."

*State v. Piper*, 2006 S.D. 1, ¶ 37, 709 N.W.2d 783, 800-01 (quoting *State v. Rhines*, 1996 S.D. 55, ¶ 185, 548 N.W.2d 415, 455-56). This Court recently identified those cases falling within this "universe." *State v. Robert*, 2012 S.D. 60, ¶ 29, 820 N.W.2d 136, 145. As we did in *Robert*, we take judicial notice of the summaries of the "universe" of cases set forth in our previous proportionality decisions. We also

include the *Robert* case, and take judicial notice of the circumstances therein as set forth in our opinion. *See id.*

[¶21.] For purposes of comparative proportionality review, "a death sentence is comparatively excessive if other defendants with similar characteristics generally receive sentences other than death for committing factually similar offenses in the same jurisdiction." *Rhines,* 1996 S.D. 55, ¶ 205, 548 N.W.2d at 457 (quoting *State v. Bey*, 645 A.2d 685, 689 (N.J. 1994)).

[¶22.] Berget argues that because the circuit court found only two statutory aggravating circumstances, his death penalty is disproportionate to those cases in which several aggravators were established. He points specifically to *Rhines*, where three aggravators were found, and *Piper*, where there were five. As pointed out by the State, in each of the cases included in the proportionality "universe" wherein this Court has affirmed the death sentence, multiple aggravators were present. Recently, this includes Eric Robert, where the circuit court found the presence of the same two aggravators found here, and this Court determined that the sentence was not disproportionate or excessive. *Robert,* 2012 S.D. 60, ¶¶ 23-26, 40, 820 N.W.2d at 144-45, 148. The circuit court found the presence of two aggravators in determining Berget eligible for the death penalty. The fact that more than two aggravators were found in other death penalty cases does not, in itself, render Berget's sentence excessive or disproportionate to those cases—comparative proportionality does not turn on simple arithmetic.

[¶23.] Berget also argues that, unlike other cases in the "universe," he showed genuine remorse. His contention that he showed remorse may not stand up

to careful reading of his allegedly remorseful statement.[4] Even if he did express remorse, such an expression does not preclude imposition of the death penalty. For example, this Court found that the death sentence of Piper was neither disproportionate nor excessive, even after Piper apologized to his victim's family in open court. *Piper*, 2006 S.D. 1, ¶¶ 32, 43, 709 N.W.2d at 800, 802.

[¶24.] Berget compares his case to *State v. Adams*. Therein, the jury found the existence of aggravated battery to be an aggravating circumstance but did not impose the death penalty. *Rhines*, 1996 S.D. 55, ¶ 188, 548 N.W.2d at 456. The mitigating circumstances present in *Adams* included the use of alcohol immediately prior to the crime. *Id*. There has been no claim made that Berget was under the influence of any substance at the time of the murder of Johnson.

[¶25.] Berget argues that the facts of *Adams, Swallow, Waff, Hoadley*, and *Wright* were all more egregious than the present facts. *See id*. ¶¶ 188, 200, 204 (discussing *Adams, Swallow,* and *Waff*); *Robert*, 2012 S.D. 60, ¶¶ 31, 39, 820 N.W.2d at 146-48 (discussing *Wright* and *Hoadley*). Even assuming that to be true, a proportionality review requires consideration of both the crime and the criminal. "Proportionality review focuses not only on the crime, but also on the defendant." *Piper*, 2006 S.D. 1, ¶ 96, 709 N.W.2d at 818. At the time he was sentenced, Berget had previously been convicted of attempted murder and kidnapping. The kidnapping charge included forcing the young woman he had abducted to engage in sexual intercourse with him while he eluded police at speeds approaching 100 miles per hour. Further, the State presented evidence of multiple escape attempts

---

4.     For a more thorough analysis of this issue, see *infra* ¶ 51.

throughout Berget's lengthy periods of incarceration. None of the cases cited by Berget involves similar criminal histories. Considering both the crime and the defendant, Berget's death sentence is not disproportionate to similar cases.

[¶26.] Berget also asserts that his sentence is internally disproportionate; *i.e.*, disproportionate to the sentence received by his co-defendant, Robert. At the change of plea hearing, Berget acknowledged his role in planning the escape attempt, physically striking Johnson with the pipe, and intending for his blows to kill Johnson. (Robert also acknowledged responsibility for killing Johnson.) Further, Berget and Robert had both been convicted of prior violent crimes, resulting in extensive prison sentences.

[¶27.] Berget does not challenge the similarity between the facts of the offense for which he and Robert were sentenced to death, but contrasts his background and characteristics with those presented in Robert's case. Berget presented mitigating evidence focusing on the tragedy of his childhood. The sentencing court was presented with no such mitigating evidence in sentencing Robert. Berget claims that this disparity between the individuals, himself and Robert, renders his death sentence disproportionate to Robert's.

[¶28.] Berget compares this matter to the differences between the sentences received in *Hoadley* and *Piper*. In *Piper*, this Court considered whether Piper's death sentence was disproportionate to the sentence of life without parole received by co-defendant Hoadley. *Id.* ¶¶ 69-96. In comparing the sentences received by Hoadley and Piper, Berget focuses on the individuals. Berget points out that

Hoadley had a miserable childhood, similar to his own. *See id.* ¶ 93. He further points out that Piper was raised in a loving family, as was Robert. *See id.*

[¶29.] In addressing the internal proportionality of sentences between co-defendants Piper and Hoadley, this Court considered the relative backgrounds of the defendants. *Id.* This Court also focused on their relative degree of culpability.

> If Hoadley had been absent that fateful day, there is nothing in the record to indicate that the torture/murder of Poage would not have taken place anyway. Piper and Page jointly planned and initiated it. On the other hand, if Piper had not been present that day, there is no evidence to indicate that Hoadley would have planned and executed the murder.

*Id.* ¶ 95. Berget testified to planning the attack and being the physical aggressor. The pipe used as a weapon contained Johnson's blood and Berget's DNA. Robert also confessed to the crime, and to his intent to kill Johnson. *Robert*, 2012 S.D. 60, ¶ 38, 820 N.W.2d at 147. In contrast to the disparate relative culpability of Hoadley and Piper, there is no way to distinguish the relative culpability between Berget and Robert.

[¶30.] The comparison between sentences received is much more similar to a comparison of the sentences received by Piper and Page than to those received by Piper and Hoadley. The most significant and readily-apparent distinction between Berget and Robert is the quality of their upbringing. Berget suffered physical abuse at the hands of his alcoholic father. He was imprisoned in the penitentiary for the first time at age 15. Robert, on the other hand, had a college degree, was loved by his mother, and had accumulated substantial wealth through hard work and saving. *Id.* ¶ 34.

[¶31.]     Piper and Page also pleaded guilty to the same murder. Piper presented substantial evidence in mitigation relating to the quality of his upbringing, including his involvement in Boy Scouts. *Piper*, 2006 S.D. 1, ¶ 32, 709 N.W.2d at 800. Upon reviewing this evidence, the sentencing court noted that "no doubt that at one time [he was] a good kid and a good scout." *Id*. Page, on the other hand, presented mitigating evidence regarding his terrible childhood. *See State v. Page*, 2006 S.D. 2, ¶ 51, 709 N.W.2d 739, 759. Regarding this evidence, the sentencing court noted: "Your early years must have been a living hell. Most people treat their pets better than your parents treated their kids." *Id*. The death sentences of both Piper and Page withstood proportionality review by this Court. *See id*. ¶ 65; *Piper*, 2006 S.D. 1, ¶ 96, 709 N.W.2d at 818. Similarly, the contrasting backgrounds of Berget and Robert do not render their death sentences disproportionate.

[¶32.]     We now turn our attention to those issues raised by Berget.

[¶33.]     **Issue 4:     Whether Berget knowingly and intelligently waived his right to a sentencing jury.**

[¶34.]     Berget argues that because he was advised at the time of his change of plea that he would have the right to confront any witnesses the State called in the pre-sentence hearing, and because evidence was admitted at that hearing over his hearsay objections, his waiver of a jury's determination of the appropriate sentence was not knowing and intelligent.

[¶35.]     Other than the testimony of Dr. Bean, which is addressed below, Berget's counsel was aware of the witnesses the State would produce and was aware of the contents of the letters containing victim-impact evidence. Berget made

no attempt to withdraw his waiver of a jury's determination of sentence, even after the circuit court made its evidentiary determinations. Furthermore, Berget does not argue that his right of confrontation would somehow be changed in front of a jury rather than in front of the judge. If Berget had the right of confrontation at sentencing, he would have had it before either a jury or a judge.

[¶36.] The circuit court's evidentiary rulings of which Berget complains hinged on application of the right of confrontation at the sentence-selection phase of these proceedings. They do not appear to turn on whether the evidence was presented before a judge or a jury. Berget has not established that he relied on any allegedly improper advisement in waiving his right to a sentencing jury.[5] Therefore, the propriety of the waiver is not implicated by the circuit court's allegedly improper advisement.

[¶37.] **Issue 5: Whether the death sentence was improperly based on extra-record evidence.**

[¶38.] Berget argues that the death sentence was improperly based on extra-record evidence. He states that this reliance on extra-record evidence deprived him of his constitutional right to confront and cross-examine his accusers. Specifically, Berget argues that the circuit court erroneously (1) used the report of Dr. Bean, a psychiatrist who examined Berget, as evidence against him[6]; (2) relied on Berget's

---

5. It is important to note that Berget, on appeal, makes no attempt to challenge the validity of his guilty plea based on the allegedly improper advisement.

6. Because of our determination of the use of the Dr. Bean report under the Fifth Amendment analysis, we decline to address whether use of the report was error based solely on its classification as "extra-record" evidence. *See infra* ¶¶ 91-118.

statements from the change of plea hearing as a source of facts of the offense; and (3) made reference to a second accomplice, Nordman, who did not appear in the record. Berget argues that these errors violated his constitutional rights. This Court reviews alleged constitutional violations de novo. *Piper*, 2006 S.D. 1, ¶ 18, 709 N.W.2d at 795 (citing *State v. Martin*, 2003 S.D. 153, ¶ 13, 674 N.W.2d 291, 296).

[¶39.] Berget faults the circuit court for relying on Berget's comments from the change of plea hearing where he provided a factual basis to support his guilty plea. A factual basis is required before a circuit court can enter a judgment on a guilty plea. SDCL 23A-7-2. This Court requires the factual basis to "appear clearly on the record." *State v. Schulz*, 409 N.W.2d 655, 658 (S.D. 1987) (citing *McCarthy v. United States*, 394 U.S. 459, 89 S. Ct. 1166, 22 L. Ed. 2d 418 (1969)). At the change of plea hearing, Berget was placed under oath and, in open court, provided a factual basis to support his guilty plea.

[¶40.] In pronouncing sentence, the circuit court quoted from Berget's own statements. Berget argues that the factual basis from the change of plea hearing was not properly admitted in the sentencing hearing, and thus, this evidence was unavailable at the sentencing hearing.

[¶41.] The facts of the crime are obviously critical to the sentencing phase of a capital penalty proceeding. Of the ten aggravating circumstances enumerated in SDCL 23A-27A-1, nine hinge on some aspect of the act for which the defendant was convicted. In a sentencing hearing without a jury, it is the judge's role to determine the existence of an aggravating factor. SDCL 23A-27A-6. Certainly, the

defendant's in-court statements concerning the offense are relevant. Berget argues that had his comments from the change of plea hearing been offered by the State, he would have made a Fifth Amendment objection. But Berget clearly waived his right against self-incrimination at the change of plea hearing before making his statement. After Berget waived his Fifth Amendment privilege and made his statement, that statement became admissible against him in further proceedings, including at sentencing.[7] "At least once the plea has been accepted, statements or admissions made during the preceding plea colloquy are later admissible against the defendant, as is the plea itself." *Mitchell v. United States*, 526 U.S. 314, 324, 119 S. Ct. 1307, 1313, 143 L. Ed. 2d 424 (1999).[8] Berget takes the position, however, that even if the statement was admissible, it was not admitted into

---

7.    At the change of plea hearing, before Berget entered his guilty plea, the circuit court advised Berget:

> You were also advised that you have a right against self-incrimination, meaning that you don't have to testify against yourself and don't have to put on any evidence whatsoever; but if you enter a guilty plea, you'd be waiving that right against self-incrimination. Neither the Court nor the State can ask you questions about the events that took place regarding Count I, and anything you say will be used as to the factual basis of your guilty plea, as well as could be used at sentencing or potentially otherwise.

Berget acknowledged his understanding.

8.    *Mitchell* holds that such a statement does not necessarily waive the privilege against self-incrimination at sentencing. *Mitchell*, 526 U.S. 314, 324, 119 S. Ct. 1307, 1313,143 L. Ed. 2d 424 (1999). Here, however, Berget was placed under oath and specifically told that any statement he made could be used at sentencing. *See supra* note 7.

evidence at the pre-sentence hearing, and therefore, was off-limits for use by the circuit court in determining a sentence.

[¶42.] Applying the dictionary definition of "record," Berget's statements from his change of plea hearing were part of the record in this case. "Usually 'record' refers to the official report of the proceedings in any case, and it has three parts: all the filed papers in the case; the verbatim transcript of hearings, conferences and testimony; and the tangible exhibits that the parties put in evidence." Bryan A. Garner, *A Dictionary of Modern Legal Usage* 741 (2d ed. 1995). The statement utilized by the circuit court was verbatim from the transcript of Berget's change of plea hearing. Thus, Berget's statements at the change of plea hearing were part of the record, not extra-record evidence as argued by Berget.

[¶43.] In his reply brief, Berget argues that he had no idea that his statements made at the change of plea hearing could be used against him in later proceedings. Otherwise, Berget argues, he would have required that the factual basis be established from other sources. *See State v. Thin Elk*, 2005 S.D. 106, ¶ 22, 705 N.W.2d 613, 619. The statement by Berget described the crime, was made in open court after he was sworn to tell the truth, and was made after a knowing and intelligent waiver of the privilege against self-incrimination. It is reasonable to conclude that the statement's use and admissibility against Berget would occur in future court proceedings.

[¶44.] Berget further argues that the circuit court considered extra-record evidence because the pre-sentence verdict contains a passing reference made to the third accomplice in this matter—Nordman. As the State points out, the reference

was made as a sort of disclaimer meant to insulate any of the court's comments regarding the facts of the crime from consideration in Nordman's then-pending criminal prosecution. Berget fails to establish how this isolated comment reveals consideration of extra-record information in the circuit court's determination of his sentence.

[¶45.] Neither Berget's statements from the change of plea hearing nor the knowledge of the existence of accomplice Nordman were improperly utilized by the circuit court in determining Berget's sentence. A de novo review of the errors urged by Berget reveals no constitutional infirmity regarding the circuit court's use of Berget's statement from the change of plea hearing, or the reference to Nordman.

[¶46.] **Issue 6:** **Whether Berget was deprived of an individualized sentencing determination.**

[¶47.] Berget argues that the sentencing court, which had previously imposed the death penalty on Robert, was unable to separate the facts of Berget's case from Robert's, depriving Berget of an individualized sentencing determination. For support, Berget points to the similarities between the pre-sentence hearing verdicts entered in both Berget's and Robert's cases. He argues that the similarities illustrate the sentencing court's inability to compartmentalize the facts presented in his case from those presented in Robert's. In support, Berget relies on *Lockett v. Ohio* for the proposition that "an individualized decision is essential in capital cases." *See* 438 U.S. 586, 605, 98 S. Ct. 2954, 2965, 57 L. Ed. 2d 973 (1978).

[¶48.] The issue in *Lockett* was the constitutionality of a death penalty scheme that, upon finding a defendant guilty with at least one of seven specified aggravating factors, required imposition of the death penalty unless the sentencing

judge found one of three enumerated mitigating circumstances by a preponderance of the evidence. *Id.* at 607, 98 S. Ct. at 2966. "[U]nder the Ohio court's construction of the statute, only the three factors specified in the statute can be considered in mitigation of the defendant's sentence." *Id.* at 608, 98 S. Ct. at 2966. The Supreme Court rejected this approach, holding that the Eighth and Fourteenth Amendments require the sentencing authority to evaluate the individual before imposing the death penalty. "The limited range of mitigating circumstances which may be considered by the sentencer under the Ohio statute is incompatible with the Eighth and Fourteenth Amendments. To meet constitutional requirements, a death penalty statute must not preclude consideration of relevant mitigating factors." *Id.* at 608, 98 S. Ct. at 2967.

[¶49.] This Court has recognized this requirement. "In determining whether an individual eligible for the death penalty should in fact receive that sentence, the law demands that the jury make an individualized determination on the basis of the character of the individual and the circumstances of the crime." *Rhines*, 1996 S.D. 55, ¶ 80, 548 N.W.2d at 437 (quoting *Tuilaepa v. California*, 512 U.S. 967, 972, 114 S. Ct. 2630, 2635, 129 L. Ed. 2d 750, 760 (1994)). This Court reiterated this requirement in *Page.* 2006 S.D. 2, ¶ 49, 709 N.W.2d at 757 (citing *Lockett*, 438 U.S. 586, 98 S. Ct. 2954). Nothing in *Lockett*, *Page,* or *Rhines* precludes the same sentencing authority from conducting the individualized sentencing determinations of two defendants convicted of the same crime. "The requirement of individualized sentencing in capital cases is satisfied by allowing the [sentencing authority] to consider all relevant mitigating evidence." *Rhines*, 1996 S.D. 55, ¶ 80, 548 N.W.2d

at 437 (quoting *Blystone v. Pennsylvania*, 494 U.S. 299, 307, 110 S. Ct. 1078, 1083, 108 L. Ed. 2d 255, 264 (1990)).

[¶50.] Berget points specifically to references to Nordman and blood-splatter evidence in the pre-sentence verdict as proof that the circuit court did not sequester Robert's facts from his own. However, the references made in the pre-sentence verdict to blood-splatter evidence are adequately supported in Berget's record. The passing reference made to Nordman is adequately addressed above.

[¶51.] Berget also claims the pre-sentence verdict ignores a statement of remorse he made at the sentencing hearing. In so doing, Berget implies that the sentencing court confuses his case with Robert's, where the court found that Robert demonstrated no remorse. At the sentencing hearing, Berget said: "I destroyed a family. I took away a father, a husband, a grandpa." This demonstrates acknowledgement of the consequences of his actions, not remorse. No remorseful word or phrase is present or can be logically inferred from this passage. There is no indication that the circuit court confused Berget's lack of remorse with Robert's.

[¶52.] Robert and Berget jointly murdered Johnson during their joint escape attempt. The facts recited by the sentencing court in both pre-sentence verdicts are similar because, in fact, they are, at a minimum, similar facts. The circuit court chose to use similar language in certain places when characterizing similar or identical facts rather than engage in a time-consuming exercise in semantics resulting in divergent language between the two verdicts. Rather than a short-cut, illustrating confusion between the defendants, this is a proper and expedient use of

judicial resources. It does not equate to a deprivation of Berget's right to an individualized sentencing determination.

[¶53.] This Court has previously analyzed whether the same circuit court can engage in an individualized sentencing determination after imposing the death penalty on a co-defendant. In *Page*, this Court addressed: "Whether the circuit judge should have recused himself from sentencing Page after it imposed the death penalty on co-defendant Piper." 2006 S.D. 2, ¶ 12, 709 N.W.2d at 749. Like Page, Berget made no motion to recuse the sentencing judge prior to sentencing.

> The decision to preside over a case lies within the sound discretion of the trial judge. [*State v.*] *Hoadley*, 2002 S.D. 109, ¶ 32, 651 N.W.2d [249,] 257 (quoting [*State v.*] *Goodroad*, 1997 S.D. 46, ¶ 25, 563 N.W.2d [126,] 132). As we have consistently stated, this Court presumes a judge was impartial absent a specific and substantial showing to the contrary. *Id.* ¶ 32 (citing *United States v. Walker*, 920 F.2d 513, 517 (8th Cir. 1990) (citation omitted)).
> . . .
>
> Similarly, we do not believe Page has presented any evidence to constitute a legitimate basis on which to call into question the circuit judge's impartiality. As grounds for disqualification, Page contends the circuit judge exhibited empathy and/or sympathy for the victim and did not sufficiently consider mitigation evidence. These arguments, however, do not establish a deep-seated antagonism against Page by the circuit judge or suggest Page was prejudiced from an extrajudicial source. Absent such a showing that a fair judgment was impossible, it was not error for the circuit judge to sentence Page after sentencing his co-defendant Piper, and, therefore, Page has failed to show plain error.

*Id.* ¶¶ 16-17, 709 N.W.2d at 749-51.

[¶54.] As in *Page*, Berget has not "presented any evidence to constitute a legitimate basis on which to call into question the circuit judge's impartiality. . . . Absent such a showing that a fair judgment was impossible, it was not error for the

circuit judge to sentence [Berget] after sentencing his co-defendant [Robert]." *See id.* ¶ 17. The similarities between Berget's pre-sentence verdict and that of Robert do not establish that Berget was deprived of an individualized sentencing determination.

[¶55.]     **Issue 7:     Whether the rules of evidence and the right of confrontation apply at a capital punishment sentencing hearing and were violated by the circuit court.**

[¶56.]     Berget next argues that the rules of evidence and the right of confrontation apply at pre-sentence hearings conducted pursuant to SDCL ch. 23A-27A, and that the circuit court's decision to allow hearsay evidence violated his constitutional right of confrontation. In order to make this claim, Berget first attempts to distinguish a capital sentencing proceeding from the provisions of SDCL 19-9-14 (Rule 1101), which exempts the rules of evidence from certain situations, including sentencing proceedings. This section provides in relevant part:

> Except as otherwise provided in this section, chapters 19-9 to 19-18, inclusive, apply to all actions and proceedings in the courts of this state. Those chapters other than those with respect to privileges do not apply in the following situations: . . . (4) Sentencing, or granting or revoking probation.

*Id.*

[¶57.]     Berget attempts to distinguish a capital punishment pre-sentence hearing from a typical criminal sentencing situation by virtue of the special characteristics of such proceeding. Berget points to other jurisdictions with rules expressly providing that the rules of evidence do not apply in capital punishment proceedings. Because South Dakota contains no such provision, Berget argues, the rules should apply.

[¶58.] Berget provides authority from other jurisdictions supporting his position that the rules of evidence apply at capital sentencing hearings. The weight of authority, however, is to the contrary. "Most death-penalty states follow the federal practice conducting capital sentencing hearings that are not subject to the same state rules of evidence that apply at the guilt phase." John G. Douglass, *Confronting Death: Sixth Amendment Rights at Capital Sentencing*, 105 Colum. L. Rev. 1967, 1981 (2005).

[¶59.] Berget complains that the circuit court violated the rules of evidence and his right to confrontation regarding evidence concerning the circumstances surrounding his criminal record. He makes this an issue of constitutional magnitude by focusing on the right of confrontation. Specifically, Berget argues that the circuit court improperly admitted evidence of remote prior conduct, as well as the facts underlying his 2003 attempted murder conviction. This evidence is not relevant to any of the statutory aggravating circumstances found by the circuit court; nor does he make an argument that the presentation of this evidence improperly influenced the circuit court regarding its finding of the statutory aggravating circumstances.

[¶60.] There are two separate inquiries to be made after a pre-sentence hearing is conducted pursuant to SDCL ch. 23A-27—a defendant's eligibility for the death penalty and, assuming the defendant is so eligible, selection of the sentence—either life or death. The first determination hinges upon proof beyond a reasonable doubt of at least one of the aggravating circumstances contained in SDCL 23A-27A-1. SDCL 23A-27A-3, -4, -6. Should at least one aggravating circumstance be found,

the defendant is eligible to receive the death penalty. The sentencer must then select between a sentence of life without parole and a sentence of death. The United States Supreme Court has recognized the distinct inquiries in capital sentencing. "Our capital punishment cases under the Eighth Amendment address two different aspects of the capital decisionmaking process: the eligibility decision and the selection decision." *Tuilaepa*, 512 U.S. at 971, 114 S. Ct. at 2634.

[¶61.]     It is to the selection inquiry that mitigating evidence and evidence of non-statutory aggravating factors are relevant. Evidence regarding Berget's criminal history, his characteristics, and circumstances of his behavior, which could be gleaned from the details of his criminal history, are non-statutory aggravating factors relevant to the selection inquiry. *See* SDCL 23A-27A-2. This Court has recognized the sentencing authority's discretion regarding the sentence-selection decision. "Additionally, we acknowledge that once aggravating circumstances have been proven beyond a reasonable doubt, the lower court has broad discretion in determining whether to sentence a particular defendant to death." *Piper*, 2006 S.D. 1, ¶ 28, 709 N.W.2d at 798 (citing *Rhines*, 1996 S.D. 55, ¶ 174, 548 N.W.2d at 454). Because the evidence about which Berget complains is relevant only to the selection inquiry, not the death eligibility inquiry, we restrict our analysis to whether the circuit court erred in admitting evidence relevant to sentence-selection.

[¶62.]     We are not the first court to grapple with this issue. Because this is an issue implicating the Sixth Amendment to the United States Constitution, other courts' analyses of the same issue in the Sixth Amendment context are relevant.

Applying the Federal Death Penalty Act, the Fifth Circuit has framed and resolved

the issue in this way:

> Rather, all of the challenged statements were introduced as part of the government's effort to establish [defendant's] past violent conduct and future dangerousness, both of which are nonstatutory aggravating factors that were included in the government's notice. The establishment of nonstatutory aggravating factors is neither necessary nor sufficient to authorize imposition of the death penalty. Nonstatutory aggravating factors may be considered by the jury in selecting an appropriate sentence once a defendant is found eligible for the death penalty, but they are not, and cannot be, used to determine that eligibility, as the Supreme Court has explained: "Statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death." *Zant v. Stephens*, 462 U.S. 862, 878, 103 S. Ct. 2733, 77 L. Ed. 2d 235 (1983). Because they relate only to nonstatutory aggravating factors, the hearsay statements challenged by [defendant] are relevant only to the jury's selection of an appropriate punishment from within an authorized range and not to the establishment of his eligibility for the death penalty. After reviewing the applicable caselaw and considering the particular importance of "individualized sentencing" in capital cases, we conclude that the Confrontation Clause does not operate to bar the admission of testimony relevant only to a capital sentencing authority's selection decision.

*United States v. Fields,* 483 F.3d 313, 325-26 (5th Cir. 2007), *cert. denied*, 552 U.S.

1144 (2008).[9] While the United States Supreme Court's confrontation

jurisprudence has not escaped criticism in the capital sentencing context, the Court

---

9.    The Fifth Circuit recently reaffirmed this holding. *United States v. Ebron*, 683 F.3d 105, 155 (5th Cir. 2012).

has, for decades, refused to mandate that the right of confrontation applies in the capital sentencing selection phase of a capital punishment proceeding.[10]

[¶63.] Liberal admission of evidence at the capital punishment selection stage, unimpeded by the requirement of confrontation, provides the sentencer with a complete picture of the character of the individual defendant. "What is important at the selection stage is an *individualized* determination on the basis of the character of the individual and the circumstances of the crime." *Zant*, 462 U.S. at 879, 103 S. Ct. at 2743-44. Toward this end, it is necessary that the sentencing authority be given access to all information relevant to this decision. "Capital sentencing procedures that permit the jury to exercise wide discretion in evaluating mitigating and aggravating facts are consistent with an individualized sentencing determination." *Rhines*, 1996 S.D. 55, ¶ 80, 548 N.W.2d at 437.

[¶64.] Liberal admission of information utilized in the capital sentence-selection phase agrees with our view of the use of evidence in non-capital sentencing. "Due process does not require that the scope of information reviewed by the sentencing judge be controlled by the rules of evidence, and consideration of out-

---

10. Today, federal appellate courts continue to cite *Williams* for the proposition that the Confrontation Clause does not apply at sentencing, whether capital or otherwise. At sentencing, prosecutors remain free to rely on hearsay that would be barred at trial by the Confrontation Clause. Thus, in capital sentencings, courts have allowed summary testimony from police and from expert witnesses, noting that such testimony satisfies the Constitution so long as the defendant is given an opportunity to rebut it.

  *Douglass*, 105 Colum. L. Rev. at 1980 (citing *Williams v. New York*, 337 U.S. 241, 245-46, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949)).

of-court information and hearsay evidence is not precluded." *State v. Habbena*, 372 N.W.2d 450, 458 (S.D. 1985) (quoting *State v. Ellefson*, 287 N.W.2d 493, 496 (S.D. 1980) (citing *Williams v. New York*, 337 U.S. 241, 69 S. Ct. 1079, 93 L. Ed. 1337 (1949))). From our review of the applicable authority, we conclude that the right of confrontation does not operate to bar the admission of evidence relevant only to a capital sentencing authority's selection decision.[11] Because Berget does not challenge the admission of evidence relevant to the statutory aggravating circumstances found by the circuit court, the circuit court did not violate Berget's right of confrontation, nor did it abuse its discretion in admitting the complained-of evidence.

[¶65.] This does not mean, however, that the sentence-selection determination is a free-for-all at which any information can be presented to the sentencing authority, regardless of its reliability. Due process requires "that a defendant cannot be sentenced to death on the basis of information undisclosed to a defendant and contained in a presentence report because, to satisfy due process, a capital defendant must be given a chance to rebut or explain adverse information introduced at sentencing." *Fields*, 483 F.3d at 328-29 (quoting *Gardner v. Florida*, 430 U.S. 349, 97 S. Ct. 1197, 51 L. Ed. 2d 393 (1977)). Further, "[a] defendant may not be sentenced on the basis of 'misinformation of constitutional magnitude.' . . . Accordingly, due process requires that some minimal indicia of reliability

---

11. This should not be read to address the applicability of the right of confrontation during presentation of evidence relevant to the death eligibility determination, *i.e.*, evidence relevant to one of the statutorily enumerated aggravated circumstances found in SDCL 23A-27A-1.

accompany a hearsay statement." *Id*. at 337 (internal citations and quotation marks omitted).

[¶66.]     Berget does not allege that he was not given a chance to rebut or explain the information admitted at the sentencing hearing about which he complains. Nor does he challenge the reliability of the information. He offers that he moved in limine to exclude some of the information of which he now complains, demonstrating his knowledge that the information would be used and therefore his opportunity to rebut or explain the information. The transcripts of the sentencing hearing confirm that Berget had an opportunity to explain, through cross-examination or otherwise, all of the evidence he argues was improperly admitted.

[¶67.]     Berget specifically challenges admission of several photographs used to illustrate the circumstances of his 2003 attempted murder conviction. The pictures depict bushes where Berget laid in wait for his eventual victims to arrive. A law enforcement officer who testified at the pre-sentence hearing discussed the pictures explaining the 2003 attempted murder. Berget was afforded an opportunity to cross-examine the law enforcement officer called to discuss the pictures. Furthermore, the photographs bore significant indicia of reliability to satisfy Berget's due process rights for sentencing purposes. The pictures were not admitted without any explanation of what they were, where they came from, etc. Rather, the law enforcement officer provided context and discussion, rendering them sufficiently reliable to illustrate Berget's behavior at the time. Additionally, the victims of the attempted murder and kidnapping testified at the pre-sentence hearing. They provided additional context and discussion of Berget's actions during

the crimes. They were also subject to cross-examination. Because the evidence of which Berget complains was relevant only to the sentence-selection inquiry, the Confrontation Clause does not apply to preclude admissibility. As it bore sufficient indicia of reliability and he was allowed to rebut or explain it, its introduction did not violate Berget's due process rights.

[¶68.] **Issue 8:** **Whether admission of evidence regarding Berget's criminal history went beyond the intended scope of SDCL 23A-27A-2(3).**

[¶69.] Berget next argues that the circuit court erred when it allowed evidence of remote "prior bad acts" into the sentencing phase. We review evidentiary issues for an abuse of discretion. *State v. Graham*, 2012 S.D. 42, ¶ 16, 815 N.W.2d 293, 301. Berget admits the evidence presented relates to previous criminal convictions, but argues that it was not part of his criminal record. Berget's argument focuses on SDCL 23A-27A-2(3). This section provides:

> In all cases in which the death penalty may be imposed and which are tried by a jury, upon a return of a verdict of guilty by the jury, the court shall resume the trial and conduct a presentence hearing before the jury. Such hearing shall be conducted to hear additional evidence in mitigation and aggravation of punishment. At such hearing the jury shall receive all relevant evidence, including:
> . . .
> (3) Any prior criminal or juvenile record of the defendant and such information about the defendant's characteristics, the defendant's financial condition, and the circumstances of the defendant's behavior as may be helpful in imposing sentence[.]

*Id.*

[¶70.] Berget argues that mitigating evidence cannot constitutionally be excluded, but that this does not translate to liberal admissibility of aggravating evidence in the sentencing phase. He asserts that the individualized sentencing

rule of *Lockett*, requiring the sentencer to consider all mitigating evidence presented by the defendant, does not relax evidentiary standards for the admission of evidence in aggravation of punishment. He further argues that the terms "criminal or juvenile record" and "defendant's characteristics" should not be interpreted so as to allow evidence concerning the facts of a defendant's criminal history.

[¶71.] Berget argues that the Supreme Court's individualized sentencing jurisprudence has been misinterpreted when used to allow liberal introduction of evidence in aggravation of punishment. However, the Supreme Court has indicated that the admission of evidence in aggravation, relevant to sentence selection as opposed to death eligibility, is not constitutionally impermissible.

> Statutory aggravating circumstances play a constitutionally necessary function at the stage of legislative definition: they circumscribe the class of persons eligible for the death penalty. But the Constitution does not require the jury to ignore other possible aggravating factors in the process of selecting, from among that class, those defendants who will actually be sentenced to death.

*Zant*, 462 U.S. at 878, 103 S. Ct. 2733 at 2744. *See also Payne v. Tennessee,* 501 U.S. 808, 822, 111 S. Ct. 2597, 2607, 115 L. Ed. 2d 720 (1991) (noting that the language utilized in a previous capital sentencing decision requiring that a capital defendant "be treated as a 'uniquely individual human being' . . . was not intended to describe a class of evidence that *could not* be received, but a class of evidence which *must* be received." (quoting *Booth v. Maryland,* 482 U.S. 496, 504, 107 S. Ct. 2529, 2534, 96 L. Ed. 2d 440 (1987))). Therefore, contrary to Berget's position, *Lockett* and its progeny require admission of all relevant evidence in mitigation of

sentence, but do not prohibit liberal admission of evidence of non-statutory aggravating factors.

[¶72.] Berget focuses attention on the timing of legislative changes to South Dakota's post-*Gregg*[12] death penalty scheme. He argues that the legislative changes demonstrate recognition that it is only evidence in mitigation of sentence that is to be liberally admitted at a capital sentencing hearing, as distinguished from evidence of non-statutory aggravating factors. Berget provides a timeline ostensibly illustrating the sequence sparked by the United States Supreme Court's *Lockett* decision in 1978. He states that at the time *Lockett* was handed down, SDCL 23A-27A-2 contained no reference to a defendant's "record" or "circumstances." He argues that the Legislature amended this section in 1979, presumably in response to *Lockett's* admonition that a sentencing authority may "not be precluded from considering, as a *mitigating factor*, any aspect of a defendant's character or record and any circumstances of the offense that defendant proffers." *See* 438 U.S. at 604, 98 S. Ct. at 2964-65 (Burger, C.J., dissenting). Therefore, he argues, the terms "record" and "circumstances of the defendant's behavior" now found in SDCL 23A-27A-2 should be limited to apply only to evidence in mitigation of sentence, and should not be interpreted to invite evidence of non-statutory aggravating factors. The fundamental flaw with Berget's argument is the foundation of the timeline.

---

12. *Gregg v. Georgia,* 428 U.S. 153, 203–204, 96 S. Ct. 2909, 2939, 49 L. Ed. 2d 859 (1976).

[¶73.] The reality is that before the 1979 legislative session, there was no SDCL 23A-27A-2. This statute, along with South Dakota's entire post-*Gregg* death penalty scheme, was not adopted until 1979. 1979 S.D. Sess. Laws ch. 160, § 5. At that time, after *Lockett* had been decided, the terms "record" and "circumstances of the defendant's behavior" did not appear in the law. *Id.* It was not until 1994 that the statute was changed to include those terms. 1994 S.D. Sess. Laws ch. 178, § 2. The 1994 amendment also added the language permitting the jury to consider "testimony regarding the impact of the crime on the victim's family." *Id.* Notably, the United States Supreme Court's decision in *Payne* was handed down in 1991. 501 U.S. 808, 111 S. Ct. 2597, 2605. The *Payne* decision overruled *Booth*, 482 U.S. 496, 107 S. Ct. 2529, and permitted victim-impact evidence to be introduced during the penalty phase of a capital trial. *Payne*, 501 U.S. at 827, 829, 111 S. Ct. at 2609, 2611. *Payne* appears to invite a legislative response.

> We thus hold that if the State chooses to permit the admission of victim-impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar. A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed. There is no reason to treat such evidence differently than other relevant evidence is treated.

*Id.* at 827, 111 S. Ct. at 2609. The 1994 amendments to the death penalty scheme were entitled, "Jury to be Told of Crimes Effect on Victims' Families in Death Penalty Cases." 1994 S.D. Sess. Laws ch. 178. It seems logical to conclude that the 1994 amendments to the death penalty scheme were in response to *Payne*, rather than to *Lockett*. Therefore, because *Payne* relaxed the constraints on admissibility of previously forbidden evidence of at least one category of non-statutory

aggravating factors, it would be illogical to frame the current statute in a manner that relaxes the constraints on admissibility of only mitigating evidence.

[¶74.]    In non-capital sentencing, sentencing courts are to look not only at the crime but also at the criminal.  In order to fashion an appropriate sentence, sentencing courts in South Dakota are instructed to "acquire a thorough acquaintance with the character and history of the person before it." *State v. Blair*, 2006 S.D. 75, ¶ 27, 721 N.W.2d 55, 63.  This allows inquiry into a wide range of topics relevant to the individual defendant, including the "defendant's general moral character, mentality, habits, social environment, tendencies, age, aversion or inclination to commit crime, life, family, occupation, and previous criminal record." *State v. Bonner,* 1998 S.D. 30, ¶ 19, 577 N.W.2d 575, 580 (internal quotation marks and citations omitted).  Furthermore, the sentencing court is given wide latitude regarding the type and source of the information utilized.  *See* SDCL 19-9-14.  *See also Blair*, 2006 S.D. 75, ¶ 27, 721 N.W.2d at 64 ("When acquiring a thorough acquaintance of the man before it, the circuit court has wide discretion with respect to the type of information used as well as its source. . . .  This consideration may include inquiry into 'uncharged conduct'[.]").  *See also Payne*, 501 U.S. at 820-21, 111 S. Ct. at 2606 ("Whatever the prevailing sentencing philosophy, the sentencing authority has always been free to consider a wide range of relevant material. . . .  In the federal system, we observed that 'a judge may appropriately consider an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come.'" (internal citations omitted)).

[¶75.]	Similarly, in the capital sentencing context, the sentencer's use of a wide range of information is appropriate to an individualized sentencing determination. "Capital sentencing procedures that permit the jury to exercise wide discretion in evaluating mitigating and aggravating facts are consistent with an individualized sentencing determination." *Rhines*, 1996 S.D. 55, ¶ 80, 548 N.W.2d at 437-38 (citing *Tuilaepa*, 512 U.S. at 974, 114 S. Ct. at 2636).

[¶76.]	The information Berget challenges regards the facts of the cases from his criminal history. A review of the pre-sentence hearing verdict reveals that the circuit court considered only the facts of the 2003 attempted murder and kidnapping convictions, not mentioning any facts regarding the rest of Berget's criminal history, other than to acknowledge its existence. The facts of the 2003 crime are relevant to the circuit court's individualized sentencing determination because they reflect on Berget's characteristics, his general moral character, tendencies, and propensity to commit future crimes.

[¶77.]	The Supreme Court has never prohibited admission of information relevant to non-statutory aggravating factors for purposes of selecting between capital punishment and life in prison. *Zant,* 462 U.S. at 878, 103 S. Ct. at 2743. Additionally, the information was relevant to the circuit court's general obligation to acquire a thorough acquaintance with Berget, which is consistent with an individualized sentencing determination. *See Rhines,* 1996 S.D. 55, ¶ 80, 544 N.W.2d at 437; *Bonner*, 1998 S.D. 30, ¶ 19, 577 N.W.2d at 580. Finally, the challenged information was relevant to the capital sentencing selection decision

based on SDCL 23A-27A-2(3). Therefore, the circuit court did not err in considering this information.

[¶78.] **Issue 9:** **Whether the circuit court allowed improper victim-impact evidence to be admitted at the pre-sentence hearing.**

[¶79.] Berget next argues that the victim-impact evidence admitted at the sentencing hearing was so prejudicial as to inflame the passions of the circuit court. This Court reviews the circuit court's ruling on the admissibility of evidence under the abuse of discretion standard. *Rhines*, 1996 S.D. 55, ¶ 133, 548 N.W.2d at 446. As this Court has recognized, victim-impact evidence is relevant to the sentence-selection determination.

> The Court began by noting that the impact of a defendant's crime is a relevant sentencing consideration: "The assessment of harm caused by the defendant as a result of the crime charged has understandably been an important concern of the criminal law, both in determining the elements of the offense and in determining the appropriate punishment."

*Id.* ¶ 131 (quoting *Payne*, 501 U.S. at 819, 111 S. Ct. at 2605).

[¶80.] Berget argues that the victim-impact evidence presented at his sentencing hearing was more prejudicial than probative, and should have been excluded, at least in part. He compares the victim-impact evidence received in this case to that found improper in *State v. Hess*, 23 A.3d 373, 392-94 (N.J. 2011). In a case that is instructive, but certainly not binding on us, the *Hess* court recognized the admissibility of victim-impact evidence generally, and framed the issue as follows:

> At sentencing, no one questions that a family member can make a statement about a homicide victim or present photographs or even a video showing the victim as he or she lived at the time

> before his or her death. The issue is whether there are any limits to the type of video that can be displayed at sentencing.

*Id.* at 392.

[¶81.]     Berget characterizes the victim-impact evidence in this case as "three family members reliving the decedent's life through a slide show of family photographs." The type of evidence in *Hess* was much more inflammatory than that received in Berget's sentencing hearing. The victim-impact evidence at issue in *Hess* was described as follows:

> The professionally produced seventeen-minute video entitled "A Tribute to Officer James Hess" played at sentencing in this case includes features that have been specifically disapproved by courts in other jurisdictions: childhood photographs and music likely to appeal solely to emotion and engender undue prejudice. The video displays approximately sixty still photographs and four home-video clips of the victim in various activities and phases of his life. The video includes photographs of the victim's childhood and his tombstone and a television segment covering his funeral. Three poems scroll over the photographs and video clips. The video is scored to popular, holiday, country, religious and military music.

*Id.* at 393.

[¶82.]     The *Hess* court concluded that elements of victim-impact evidence with no probative value, but with great capacity to unduly arouse or inflame emotions, should not be permitted. This includes information that "do[es] not project anything meaningful about the victim's life as it relate[s] to his family and others at the time of his death." *Id.* at 394. The court indicated, however, that the video itself did not have the "capacity to alter the outcome of the sentence." *Id.*

[¶83.]     Victim-impact evidence has its limits. Introduction of overly prejudicial victim-impact evidence has the possibility to rise to the level of a

constitutional deprivation. *Payne,* 501 U.S. at 825, 111 S. Ct. at 2608 ("In the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief."). The victim-impact evidence presented here, however, did not cross that line.

[¶84.]     The evidence consisted of pictures of Johnson, introduced and discussed by his son, daughter, and wife, as well as letters from other family members, friends, and co-workers. The evidence presented at this sentencing hearing was appropriately offered to illustrate the consequences of Berget's actions. As we stated in *Rhines*: "To paraphrase *Payne*, the victim impact [evidence] 'illustrated quite poignantly some of the harm that [Berget's] killing had caused; there is nothing unfair about allowing the [judge] to bear in mind that harm at the same time as it considers the mitigating evidence introduced by the defendant.'" *See Rhines*, 1996 S.D. 55, ¶ 136, 548 N.W.2d at 447 (quoting *Payne*, 501 U.S. at 826, 111 S. Ct. at 2609). The evidence may have been prejudicial; it showed the human side of Johnson and translated his loss into human terms.[13] However, the probative value of the evidence was not outweighed by its prejudicial effect. It was not an abuse of discretion for the circuit court to admit the evidence.

---

13.   According to *Hess*, the pictures of the family witnessing the funeral and pictures of the gravesite must be subjected to intense scrutiny because they "do not project anything meaningful about the victim's life as it related to his family and others at the time of his death." 23 A.3d at 393-94. Introduction of these pictures did not, however, render the trial fundamentally unfair, violating Berget's right to due process.

[¶85.]     **Issue 10:     Whether the circuit court failed to make an adequate record on evidentiary questions.**

[¶86.]     According to Berget, without citation to the record, the circuit court relied on the presumption that it made correct determinations of evidentiary questions rather than ruling on evidentiary questions on the record. Therefore, Berget argues that there is no way of knowing whether the circuit court considered improperly-admitted evidence.

[¶87.]     Judges are presumed to correctly apply the law in making their decisions. As we stated in *Page*: "But the logic of these cases has no place in the context of sentencing by a trial judge. Trial judges are presumed to know the law and to apply it in making their decisions." 2006 S.D. 2, ¶ 27, 709 N.W.2d at 754 (quoting *Walters v. Arizona*, 497 U.S. 639, 653, 110 S. Ct. 3047, 3057, 111 L. Ed. 2d 511 (1990)).

[¶88.]     Berget argues that if this Court were to find any exhibit should not have been admitted or that any testimony should be stricken, we must reverse because there is no way to know that the circuit court did not rely on the inappropriate evidence. Leaving aside for the moment the presumption that the circuit court knew the law and correctly applied it, other than the Dr. Bean report, we have addressed each of Berget's alleged evidentiary errors above. Assuming the evidence Berget challenges was considered by the circuit court, none of it was improperly considered. All of the evidence about which Berget complains is relevant to the death selection inquiry and, as discussed above, the sentencer is to have access to a wide range of information at that stage. Therefore, as to the evidence, other than the Dr. Bean report, even without knowing whether the circuit

-37-

court considered the evidence Berget claims was erroneously admitted, this Court still finds no error. Berget's argument in this regard is without merit.

[¶89.]     **Issue 11:     Whether Berget's sentence violates evolving standards of decency.**

[¶90.]     Berget claims that the United States Supreme Court's recent cases demonstrate a shift in the "evolving standards of decency." According to Berget, recent United States Supreme Court decisions pave the way for a determination that this State's "standard of decency" has evolved to the point where the punishment of death is no longer morally tolerable. Berget specifically references *Graham v. Florida*, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010) and *Miller v. Alabama*, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012). In *Graham*, the Court banned sentences of life without parole for juveniles who were convicted of a crime other than homicide. 130 S. Ct. at 2030. The *Miller* Court banned mandatory life without parole sentences for juveniles. 132 S. Ct. at 2469 ("We therefore hold that the Eighth Amendment forbids a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders."). These cases focus on the interplay between the culpability of juveniles and the propriety of sentencing them to life without parole for conduct committed during their youth. "By making youth (and all that accompanies it) irrelevant to imposition of that harshest prison sentence, such a scheme poses too great a risk of disproportionate punishment." *Id.* at 2469. Berget committed this offense as an adult. While *Graham* and *Miller* may illustrate a shift in the nation's moral tolerance for sentences of life without parole for juvenile offenders, we do not read these decisions as evidencing any shift of tolerance regarding capital punishment of adult offenders.

[¶91.]     **Issue 12:    Whether the circuit court violated Berget's right against self-incrimination by considering a portion of a psychiatric report in determining Berget's sentence.**

[¶92.]     During the pendency of these proceedings, Berget's counsel moved for and obtained a psychiatric evaluation of Berget.  Dr. David Bean conducted the examination.  The circuit court and the State were provided copies of the Dr. Bean report.  The existence of Dr. Bean's report was disclosed to the State and the circuit court with the understanding that the document would be kept under seal unless Dr. Bean was called by Berget as a witness.  Berget claims that because the document was filed under seal, Dr. Bean was never called as a witness, and Berget's competency was never placed in issue, the circuit court erred by referring to a statement he made to Dr. Bean included in the report.  Neither the State nor Berget requested that the circuit court consider the Dr. Bean report in fashioning a sentence.  Berget claims the reference was "a justification for imposing the death penalty."  The language of the pre-sentence verdict referencing the Dr. Bean report provides as follows:

> The Court considers Berget's acceptance of responsibility by his guilty plea and his desire to have accepted responsibility early on in the proceedings to be evidence of mitigation.  Acceptance of responsibility early on in a matter typically saves the state the time and/or expense of having to prove the elements of the offense of which the accused is charged.  Early acceptance of responsibility typically saves the victim and/or victim's family the emotional suffering of having to re-live the event by testifying in court or prolonging the wait for justice to be served. The Court does recognize here, however, that Berget's intent for wishing to enter an early guilty plea may have had nothing to do with saving the state time and/or money or sparing the victim's family of having to wait for justice, but rather may be solely to serve Berget's own "wish it would be over". . . .  Forensic

> Psychiatric Evaluation of Rodney Berget dated December 28, 2011, page 18.

The court indicates that it chose to view Berget's early acceptance of responsibility as a mitigating factor, even though there was information available to the court per the Dr. Bean report suggesting the possibility that Berget's motive was not efficient administration of justice and sparing the family the emotional suffering of a trial.

[¶93.]     Berget argues that the information from the Dr. Bean report was used by the circuit court to weigh against the mitigating effect of Berget's early acceptance of responsibility. In essence, Berget argues that even though the circuit court indicated it considered his early acceptance as a mitigating factor, the use of the Dr. Bean report illustrates that in fact the court did not give this evidence appropriate mitigating weight in selecting between life and death.

[¶94.]     The relevant procedural facts regarding Dr. Bean's report discernible from the record are as follows. On December 27, 2011, Berget's counsel moved for a psychiatric evaluation to determine Berget's competency.[14] Shortly thereafter, the State made a similar motion. At a motions hearing, Berget's counsel agreed to produce the report to both the circuit court and the State with the understanding that the report would be kept under seal unless Berget made his competency an issue. Counsel provided:

> We have the report from Dr. Bean. We have shared that with the State. We intend to share it with the Court, and I have a copy for the Court with the understanding—I believe the State is agreeing to this—is that it be kept under seal so both the

---

14.     During oral argument, Berget's counsel indicated that the request for psychiatric evaluation was precipitated by the circuit court's indication that an evaluation would be ordered whether Berget moved for one or not.

-40-

> Court and State [are] satisfied that competency issues have been
> addressed, and the only way the seal be released is if we would
> in fact call Dr. Bean to testify at the penalty phase starting the
> 30th of January, but for now we are submitting it to the Court
> for the Court's consideration and review. I've given a copy to
> [State] also.

No further mention was made of the report until the circuit court included citation

to the report in its pre-sentence verdict.

[¶95.]     It is not until his reply brief that Berget raises a Fifth Amendment

challenge to the use of his statement to Dr. Bean extracted from Dr. Bean's report.[15]

Specifically, Berget argues that the circuit court's use of the Dr. Bean report

violated his right against self-incrimination as identified by the United States

Supreme Court in *Estelle v. Smith*, 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359

(1981). This Court reviews alleged constitutional violations de novo. *Piper*, 2006

---

15. Berget's counsel asserts that his first opportunity to raise this issue came
    after the circuit court had utilized the information in its sentencing verdict.
    However, counsel had at least two opportunities to raise this issue prior to
    his reply brief. After the circuit court orally pronounced its sentence, the
    State filed proposed findings and conclusions. State's proposed conclusion
    #42 mirrored the circuit court's use of the Dr. Bean report. In his objections,
    filed three weeks after the circuit court issued its initial ruling, Berget's
    counsel objected to Conclusion # 42 without citing the Fifth Amendment or
    *Estelle v. Smith*. 451 U.S. 454, 101 S. Ct. 1866, 68 L. Ed. 2d 359 (1981).
    "Conclusion # 42 is not a legal conclusion, but a factual finding without
    support in the record, and cites to information not admitted into evidence at
    the penalty phase hearing." Again, in his initial appellant brief, Berget had
    the opportunity to argue that the inclusion of this evidence violated Berget's
    right against self-incrimination. Berget cited *Estelle v. Smith* later in his
    initial brief when discussing his view that the death penalty as imposed upon
    Berget violates society's evolving standards of decency, but did not raise the
    Fifth Amendment issue until he filed his reply brief. This prevented the
    State from being able to address the issue at any level. However, given the
    gravity of the stakes, as well as the constitutional magnitude of the
    argument, we decline to view the argument as forfeited. *See* SDCL 15-26A-2
    (allowing this Court to suspend the requirements of the rules of appellate
    procedure without motion by either party).

#26318

S.D. 1, ¶ 18, 709 N.W.2d at 795 (citing *Martin*, 2003 S.D. 153, ¶ 13, 674 N.W.2d 291 at 296).

[¶96.]     In *Estelle,* prior to trial, a Texas trial court judge ordered that the defendant, Smith, who had been indicted on first-degree murder charges, undergo a psychiatric examination for the purpose of determining competency.  451 U.S. at 456-57, 101 S. Ct. at 1870.  The psychiatrist completed the examination and sent a letter containing his conclusions to the circuit judge.  *Id.* at 457, 101 S. Ct. at 1820. This letter was also placed in the court file.  *Id.*

[¶97.]     At trial, a jury convicted Smith of murder.  *Id.*  In order for the death penalty to be imposed, the jury needed to find that "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society."  *Id.* at 458, 101 S. Ct. at 1870.  In order to satisfy this requirement, the State called the psychiatrist who had conducted the court-ordered evaluation.  *Id.* at 459, 101 S. Ct. at 1871.  Defense counsel was aware that the court's file contained the report, but was not made aware that the psychiatrist would be testifying.  *Id.*  Over defendant's objection, the trial court allowed the psychiatrist to testify.  *Id.*  The psychiatrist testified that Smith was a severe sociopath whose condition would only get worse, and that given the opportunity, Smith would commit similar acts again.  *Id.* at 459-60, 101 S. Ct. at 1871.  After the jury determined Smith to be a continuing threat to society, the death penalty was imposed.  *Id.*

[¶98.]     The federal district court in Texas granted Smith habeas relief, the Court of Appeals affirmed, and the United States Supreme Court considered the

matter. *Id*. at 460-61, 101 S. Ct. at 1871-72. The Court first determined that the Fifth Amendment applied to the penalty phase of Smith's trial. "We can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as the protection of the Fifth Amendment privilege is concerned." *Id*. at 462-63, 101 S. Ct. at 1873. The Court then noted that, because the psychiatrist's opinion was based on Smith's unwarned comments made during the psychiatric evaluation, the Fifth Amendment was implicated. "The Fifth Amendment privilege, therefore, is directly involved here because the State used as evidence against [Smith] the substance of his disclosures during the pretrial psychiatric examination." *Id*. at 464-65, 101 S. Ct. at 1874.

[¶99.]     The Court determined that when the psychiatrist "went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of [Smith's] future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." *Id*. at 467, 101 S. Ct. at 1875. The Court held that the psychiatrist's testimony violated Smith's Fifth Amendment right to be free from compelled self-incrimination. "A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding." *Id*. at 468, 101 S. Ct. at 1876.

[¶100.]     Berget argues that application of *Estelle* to the present facts likewise requires reversal of his sentence. As in *Estelle*, Berget's statements made during a

psychiatric interview conducted for the purpose of establishing his competency were arguably used against him during the capital sentencing proceeding. Also like *Estelle*, Berget had no notice that such testimony would be used during the sentencing phase of the proceeding. There are notable distinctions, however. First, the psychiatric evaluation performed in *Estelle* was ordered by the trial court sua sponte. *Id*. at 456-57, 101 S. Ct. 1870. Here, Berget's counsel made the initial motion for the evaluation. In *Estelle*, the prosecuting attorney called the psychiatrist to the stand to testify regarding Smith's future dangerousness. *Id*. at 458-59, 101 S. Ct. at 1871. In the present matter, neither the State nor Berget were aware the circuit court would utilize the Dr. Bean report in fashioning a sentence. Additionally, the jury was required in *Estelle* to make a determination as to Smith's future dangerousness before the death penalty could be imposed. *Id*. at 458, 101 S. Ct. at 1870. Here, the Dr. Bean report was used as part of the circuit court's sentence-selection determination, wherein the court considered evidence in mitigation and aggravation of punishment. These distinctions are particularly relevant because in the opinion itself, the Court notes that the holding is based on the "distinct circumstances" presented. *Id*. at 466, 101 S. Ct. at 1875. In applying *Estelle*, the Supreme Court has focused on this limitation.

[¶101.] In *Buchanan v. Kentucky*, a non-capital murder case, after noting that the holding in *Estelle* was based on the "distinct circumstances" of that case, the Court noted one of the limits of the *Estelle* holding. 483 U.S. 402, 422-23, 107 S. Ct. 2906, 2917-18, 97 L. Ed. 2d 336 (1987).

> We further noted: 'A criminal defendant, who neither initiates a
> psychiatric evaluation nor attempts to introduce any psychiatric

> evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding.' (citation omitted). This statement logically leads to another proposition: if a defendant requests such an evaluation or presents psychiatric evidence, then, at the very least, the prosecution may rebut this presentation with evidence from the reports of the examination that the defendant requested. The defendant would have no Fifth Amendment privilege against the introduction of this psychiatric testimony by the prosecution.

*Id.* at 422-23, 107 S. Ct. at 2917-18. In *Buchanan*, the defendant requested the psychiatric evaluation and placed his mental status into issue in the case. *Id.* at 423, 107 S. Ct. at 2918. The Court held that introduction of the psychiatrist's report setting forth his observations about the mental state of Buchanan for the limited purpose of rebutting Buchanan's proffered evidence regarding his mental status did not violate the Fifth Amendment. *Id.* at 423-24, 107 S. Ct. at 2918.

[¶102.] The Court again considered application of *Estelle* in *Penry v. Johnson*. 532 U.S. 782, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001). In *Penry*, the Court faced introduction, during the penalty phase of a jury trial, of statements from a psychiatric report dealing with the issue of a defendant's future dangerousness. *Id.* at 793-95, 121 S. Ct. at 1918-19. This time, the report had been conducted in connection with a previous criminal prosecution. *Id.* at 794, 121 S. Ct. at 1919. The habeas applicant argued that *Estelle* controlled. *Id.* The Court disagreed, focusing on the differences between the circumstances presented and those the Court faced in *Estelle*. *Id.* at 794-95, 121 S. Ct. at 1919. Significantly, the Court noted that "the defendant in *Estelle* had not placed his mental condition at issue, . . . whereas Penry himself made his mental status a central issue in both the [earlier case and the present case]." *Id.* at 794, 121 S. Ct. at 1919. Also, the Court noted that in *Estelle*,

the Court had ordered the psychiatric examination sua sponte, whereas Penry's then-counsel requested the psychiatric evaluation under consideration. *Id.* In affirming denial of habeas relief, the Court held that the Texas court's decision not to apply *Estelle* to Penry's trial was not "contrary to or an unreasonable application of our precedent." *Id.* at 795, 121 S. Ct. at 1919. In so doing, the Court explicitly limited the *Estelle* holding to its facts.

> The differences between this case and *Estelle* are substantial, and our opinion in *Estelle* suggested that our holding was limited to the 'distinct circumstances' presented there. It also indicated that the Fifth Amendment analysis might be different where a defendant 'intends to introduce psychiatric evidence at the penalty phase'. . . . Indeed, we have never extended *Estelle's* Fifth Amendment holding beyond its particular facts.

*Id.* at 795, 121 S. Ct. at 1919 (internal citations omitted).

[¶103.]     The Third Circuit Court of Appeals synthesized these holdings as follows:

> If we lay these decisions out, the following landscape emerges. A compelled psychiatric interview implicates Fifth and Sixth Amendment rights ([*Estelle*]). Before submitting to that examination, the defendant must receive Miranda warnings and (once the Sixth Amendment attaches) counsel must be notified ([*Estelle*]). The warnings must advise the defendant of the "consequences of foregoing" his right to remain silent ([*Estelle*]). The Fifth and Sixth Amendments do not necessarily attach, however, when the defendant himself initiates the psychiatric examination (*Buchanan, Penry*). Similarly, the Fifth–but not Sixth–Amendment right can be waived when the defendant initiates a trial defense of mental incapacity or disturbance, even though the defendant had not been given Miranda warnings (*Buchanan, Powell*). But that waiver is not limitless; it only allows the prosecution to use the interview to provide rebuttal to the psychiatric defense (*Buchanan, Powell*). Finally, the state has no obligation to warn about possible uses of the interview that cannot be foreseen because of future events, such as uncommitted crimes (*Penry*).

*Gibbs v. Frank*, 387 F.3d 268, 274 (3d Cir. 2004). It is important to note that Berget does not claim his Sixth Amendment right to counsel, as addressed in *Estelle*, was violated. Correctly so, as the fact that his counsel moved for the psychiatric report, whether compelled to do so by the circuit court or not, would vitiate this claim. It is also relevant to note that the *Powell* decision referenced in *Gibbs* focused on the Sixth Amendment, not the Fifth Amendment, as argued by Berget. *See Powell v. Texas*, 492 U.S. 680, 109 S. Ct. 3146, 106 L. Ed. 2d 551 (1989).

[¶104.] Applying *Estelle* and its Supreme Court progeny to the facts of this matter presents a very close question. Initially, it is noteworthy that Berget's counsel moved for the psychiatric evaluation of Berget. The Supreme Court noted the importance of this distinction from *Estelle* in *Buchanan*. *Buchanan*, 483 U.S. at 422-23, 107 S. Ct. at 2917-18. In *Buchanan*, the defendant joined in the motion for a psychiatric examination, very similar to Berget's motion in the present situation. *Id*. at 423, 107 S. Ct. at 2918. Again in *Penry*, the Court noted that the offending psychiatric evaluation was performed upon request of Penry's counsel. "Second, in *Estelle,* the trial court had called for the competency evaluation and the State had chosen the examining psychiatrist. . . . Here, however, it was Penry's own counsel in the 1977 case who requested the psychiatric exam." *Penry*, 532 U.S. at 794, 121 S. Ct. at 1919. A review of the motion for psychiatric evaluation made by Berget's counsel, as well as that of the State, demonstrates that the purpose of the evaluation was to determine Berget's competency. Nothing in the record suggests that Berget was preparing to present a defense based on his mental status at the time of trial or the time of the crime.

[¶105.]      Although not faced with a situation in which the defendant had placed his mental status into issue, the Supreme Court in *Estelle* made the importance of this issue clear. *Estelle*, 451 U.S. at 465-66, 101 S. Ct. at 1874-75. Both *Buchanan* and *Penry* focused on the issue. "Moreover, petitioner's entire defense strategy was to establish the 'mental status' defense of extreme emotional disturbance." *Buchanan*, 483 U.S. at 423, 107 S. Ct. at 2918. "This case differs from *Estelle*, in several respects. First, the defendant in *Estelle* had not placed his mental condition at issue, . . . whereas Penry himself made his mental status a central issue in both the 1977 rape case and his trials for Pamela Carpenter's rape and murder." *Penry*, 532 U.S. at 794, 121 S. Ct. at 1919. At no point did Berget raise his mental condition as a possible defense to the crime. Further, any argument he may have made that his mental condition should weigh against imposition of the death penalty, he made without the assistance of psychiatric testimony. In both *Buchanan* and *Penry*, the defendants produced psychiatric testimony to support their positions. *Buchanan*, 483 U.S. at 409, 107 S. Ct. 2910; *Penry*, 532 U.S. at 794, 121 S. Ct. at 1919. As such, like *Estelle*, Berget cannot be said to have placed his mental status in issue in a manner similar to the defendants in *Buchanan* and *Penry*. This similarity, however, leads to another point of distinction between this case and *Estelle*.

[¶106.]      In *Estelle*, the psychiatric evidence was used affirmatively by the State to establish the defendant's future dangerousness, an issue the State bore the burden of proving in order for the death penalty to be imposed. 451 U.S. at 458-60, 101 S. Ct. at 1870-71. The Court noted that when the psychiatrist testified for the

State, he became, in essence, an agent of the State. "When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a postarrest custodial setting." *Id.* at 467, 101 S. Ct. at 1875. In *Buchanan*, the Court distinguished *Estelle*, noting that the testimony presented at trial was introduced for a "limited rebuttal purpose." 483 U.S. at 423-24, 107 S. Ct. at 2918. This distinction was also noted in *Penry*. "Third, in *Estelle*, the State had called the psychiatrist to testify as part of its affirmative case. . . . Here, it was during the cross-examination of Penry's own psychological witnesses that the prosecutor elicited the quotation from the [psychiatrist's] report." *Penry*, 532 U.S. at 794, 121 S. Ct. at 1919.

[¶107.] In this case, the State did not call Dr. Bean to testify, nor apparently was it aware that the court would consider Dr. Bean's report. Additionally, Berget's statement to Dr. Bean used in the pre-sentence verdict was noted by the circuit court as potentially rebutting the idea that Berget's early acceptance of responsibility was motivated by a desire to spare the victim's family from proceeding through a trial. However, in both *Penry* and *Buchanan*, the psychiatric testimony at issue was used to rebut psychiatric evidence introduced by the defendant. *See id.*; *Buchanan*, 483 U.S. at 423-24, 107 S. Ct. at 2918. Here, again, Berget made no attempt to introduce any psychiatric evidence regarding his state of mind in relation to early acceptance of responsibility. Furthermore, even though the Dr. Bean report containing the problematic statement was not offered by the

State, it was used to rebut evidence in mitigation of the crime, the relevance of which is to justify imposition of the death penalty, the position argued by the State.

[¶108.] The present circumstances are distinguishable in material respects from *Estelle*, but also distinguishable from both *Buchanan* and *Penry*. Importantly, Berget did not place his mental condition in issue. Had he done so, his counsel would have been aware that any statement he made to the psychiatrist could have been used as impeachment against him, at least insofar as his mental condition was concerned. Counsel could have advised Berget of such, and the decision to agree to the psychiatric evaluation would have been fully informed. Because he did not place his mental status in issue—the fact that he moved for the psychiatric examination is of less importance—he still did not contemplate that the exam would be used to gather evidence which would be used to decide whether he should live or die. Nor was the State's inability to respond to the defendant's psychiatric evidence hampered by the availability of the defendant's potential invocation of his right against self-incrimination during an evaluation conducted by an agent for the State. With no intent to place his mental condition into issue, Berget could not foresee that his statements to Dr. Bean would be used against him as justification for imposition of the death penalty. "Yet he was given no indication that the compulsory examination would be used to gather evidence necessary to decide whether, if convicted, he should be sentenced to death." *Estelle*, 451 U.S. at 467, 101 S. Ct. at 1875.

[¶109.] Here, it could be argued that because Berget moved for the evaluation, his testimony to the psychiatrist was not compelled, and therefore does not

implicate the Fifth Amendment. Other courts have refused to apply *Estelle* based on the lack of compelled testimony when the defendant moved for the psychiatric examination. *See, e.g., State v. Smith*, 863 P.2d 1000, 1004 (Mont. 1993) ("The Fifth Amendment violation in *Estelle* arose from the state's use of a defendant's statements elicited at a court-ordered competency examination. We determined that Smith had waived his Fifth Amendment privilege regarding statements made during [the psychiatrist's] interview because, unlike the *Estelle* defendant, he initiated the psychiatric examination. Thus, no compelled testimony was placed before the court."). Berget initiated the evaluation for purposes of determining his competency. The contents of the evaluation, including his statement, were only made available with the understanding that they would not be used unless Berget placed his competency into issue. All parties agreed. The circuit court utilized the information in the report for the purpose of sentencing, without alerting Berget that it would do so, essentially compelling Berget to be a witness against himself.

[¶110.] Further, this Court has analyzed the use at trial of a criminal defendant's statements made to a psychiatrist during an evaluation requested by the defendant under the Fifth Amendment's protection against compelled testimony. *State v. Devine*, 372 N.W.2d 132, 133-34 (S.D. 1985). In *Devine*, the statements at issue were made by the defendant to a psychiatrist appointed by the court, including statements made to a psychiatrist appointed upon motion of the defendant, and introduced at trial where the jury was to determine both guilt and sanity. *Id.* at 133. The defense psychiatrist was called as a witness by the state "and allowed to reveal [defendant's] statements." *Id.* This Court acknowledged that

"[t]he Fifth Amendment privilege bars the use of an incriminating statement made to a psychiatrist for the purpose of proving a defendant's guilt." *Id.* at 134. The majority opinion does not specifically refer to the testimony given during the evaluations as "compelled," even though the relevant discussion concerns the Fifth Amendment. *Id.* at 135.[16] The dissent, however, observed no such restraint. "I can well understand that the fruits of the accused's compelled disclosures may be used in determining his competency to stand trial, but surely it cannot be used against him at the trial itself." *Id.* at 140 (Henderson, J., dissenting).

[¶111.] *Devine* provides that evidence of a defendant's statements made to a psychiatrist for the purpose of determining the defendant's competency, admitted as evidence of the defendant's guilt, implicate the Fifth Amendment even when the defendant moves for the competency evaluation. Therefore, the fact that Berget moved for the psychiatric evaluation does not, in these specific circumstances, remove this situation from evaluation under *Estelle*. As the Supreme Court made clear in *Estelle*, there is no distinction between the guilt and penalty phases of a capital sentencing procedure for purposes of applying the Fifth Amendment's protection against self-incrimination. *Estelle*, 451 U.S. at 462-63, 101 S. Ct. at 1873.

[¶112.] Furthermore, to hold that any statement made during such a competency evaluation could be used to weigh in favor of imposition of the death

---

16. After stating that the Fifth Amendment was implicated, the Court framed the issue as follows: "Whether such incriminating statements are admissible to establish mental condition in a unitary trial which involves both sanity and guilt issues, without prejudicing the defendant's due process rights." *Id.* at 135.

penalty may prevent defense counsel from recommending their client agree to a competency exam. Because of the gravity of determining competency in these situations, courts could then be forced to compel evaluations, at which time defense counsel may recommend the defendant remain silent. The Supreme Court of California has recognized this dilemma.

> A rule allowing a defendant to be impeached at trial with statements made during a competency examination would pose a dilemma for defendant's trial attorney. A competency examination occurs after the right to counsel has attached, at a critical stage of the proceeding at which counsel's participation is constitutionally mandated; the examination cannot be conducted without "the assistance of [defendant's] attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." Counsel would need to explain the risk of impeachment to the possibly mentally impaired defendant and, if that risk was sufficiently grave, might be ethically bound to advise the defendant not to communicate with the court-appointed mental health professional at all during the examination.

*People v. Pokovich*, 141 P.3d 267, 275-76 (Cal. 2006) (quoting *Estelle*, 451 U.S. at 470-71, 101 S. Ct. at 1877).

[¶113.] At the end of the analysis, we are left with the circuit court's use of Berget's statement, made at a psychiatric examination ordered by the court at the request of counsel and potentially used against him as evidence that he should be sentenced to death. Even though *Estelle* has been repeatedly limited to its facts, the relevant distinctions present here do not undermine the rationale of the Supreme Court's decision in *Estelle*. Given the specific facts of this case, the use of Berget's unwarned statement to Dr. Bean utilized to weigh against the mitigating evidence

available, and therefore as justification for imposition of the death penalty, was

error.

[¶114.] We must next determine whether this error requires reversal. This

Court has held that even constitutional error can be harmless.

> SDCL 23A-44-14 defines harmless error as "[a]ny error, defect, irregularity or variance which does not affect substantial right[s]." The harmless error rule governs even constitutional violations, not requiring the automatic reversal of a conviction, provided the court is able to declare a belief beyond a reasonable doubt that the error was harmless and did not contribute to the verdict obtained.

*State v. Younger*, 453 N.W.2d 834, 838 (S.D. 1990) (citing *State v. Heumiller*, 317

N.W.2d 126, 130 (S.D.1982) (citing *Chapman v. California*, 386 U.S. 18, 87 S.Ct.

824, 17 L. Ed. 2d 705 (1967))). The harmless error rule "promotes the public respect

for the criminal process by focusing on the underlying fairness of the trial rather

than on the virtually inevitable presence of immaterial error." *State v. Zakaria*,

2007 S.D. 27, ¶ 19, 730 N.W.2d 140, 146 (citations omitted).

[¶115.] This is the standard utilized by the United States Supreme Court in

determining whether *Estelle* error requires reversal. *Satterwhite v. Texas* applied

harmless error analysis to application of *Estelle's* Sixth Amendment holding in the

context of a direct appeal of a state court decision in a capital case. 486 U.S. 249,

258, 108 S. Ct. 1792, 1798, 100 L. Ed. 2d 284 (1988). Like the Sixth Amendment,

admission of evidence in violation of the Fifth Amendment is subject to harmless

error analysis. *Neder v. United States*, 527 U.S. 1, 18, 119 S. Ct. 1827, 1838, 144 L.

Ed. 2d 35 (1999). *See also Devine*, 372 N.W.2d at 137-38 (concluding that admission

at trial of the statements made by the defendant to his psychiatrist at a competency evaluation were "no more than harmless error.").

[¶116.] The error here was the use of Berget's statement to Dr. Bean as evidence weighing against the mitigating evidence available. The issue is whether this Court can "declare a belief beyond a reasonable doubt that the error was harmless and did not contribute to the verdict obtained." *See Younger*, 453 N.W.2d at 838. The sentencing authority's task during the sentence-selection phase is not an easy one. It must weigh the evidence presented and make a determination between life and death. The defendant's own statements which tend to diminish the effect of the mitigating evidence presented can be influential toward that task. Additionally, the nature of the weighing task makes it difficult to determine whether, without using Berget's statement contained in the Dr. Bean report, the result of the weighing process would have been different.

[¶117.] "Harmlessness must . . . be determined on the basis of the remaining evidence." *Zakaria*, 2007 S.D. 27, ¶ 19, 730 N.W.2d at 146 (citations omitted). Berget made a statement in open court during the pre-sentence hearing. When provided the opportunity to make a statement to the court after all evidence had been received, Berget stated:

> All I have to say is that I'm guilty of taking Ronald Johnson's life. I knew what I was doing on the day when I went over to the shops, and I continued to do it. I destroyed a family. I took away a father, a husband, a grandpa. They'll never see their father again or husband. He will never walk through that door again. I made sure of that by my actions. I'm not going to beg the Court or ask the Court to spare my life. I believe I deserve the death penalty for what I've done. That's all I have to say.

This statement, while expressing Berget's belief that he deserves the death penalty, does not touch on his motivation for pleading guilty. Therefore, the remaining evidence does not explicitly support the proposition that Berget's motivation for pleading guilty was selfish.

[¶118.] Even though it is difficult to determine the weight given by the circuit court to Berget's statement to Dr. Bean, the importance of Berget's motivation for pleading guilty is clear.

> "Few facts available to a sentencing judge," we have observed, "are more relevant to the likelihood that [a defendant] will transgress no more, the hope that he may respond to rehabilitative efforts to assist with a lawful future career, [and] the degree to which he does or does not deem himself at war with his society" than a defendant's willingness to cooperate.

*Mitchell*, 526 U.S. at 339, 119 S. Ct. at 1320 (Scalia, J., dissenting) (quoting *Roberts v. United States*, 445 U.S. 552, 558, 100 S. Ct. 1358, 63 L. Ed. 2d 622 (1980)). This is not to say that acceptance of responsibility necessarily trumps all aggravating factors relevant to the sentence-selection determination, but it is obviously important. Due to the importance of this information, we cannot determine that the circuit court's error in utilizing Berget's statement to Dr. Bean for the purpose of diminishing the value of Berget's acceptance of responsibility was harmless beyond a reasonable doubt. We therefore reverse Berget's sentence and remand for resentencing without the use of or consideration of Dr. Bean's report unless Berget opts to call Dr. Bean to testify.

## CONCLUSION

[¶119.] In selecting a sentence, the circuit court improperly considered statements made by Berget to Dr. Bean during a competency evaluation. This was

a violation of Berget's right to be free from self-incrimination. We cannot conclude that the use of this statement was harmless beyond a reasonable doubt.

[¶120.]     Pursuant to SDCL 23A-27A-13(2), we remand to the circuit court for the purpose of conducting a sentencing without this error. Per this statute, it is to be conducted on the existing record without reference to, or considering of, the report of Dr. Bean.

[¶121.]     In all other respects, the appeal is affirmed.

[¶122.]     KONENKAMP, ZINTER, and SEVERSON, Justices, concur.

[¶123.]     MILLER, Retired Justice, concurs in part and dissents in part.

[¶124.]     MILLER, Retired Justice, sitting for WILBUR, Justice, disqualified.


MILLER, Justice (Ret.) (concurring in part and dissenting in part).

[¶125.]     I fully concur with the majority on Issues 1 - 11. However, I dissent on Issue 12.

[¶126.]     The majority found that the circuit court used "Berget's unwarned statement to Dr. Bean . . . to weigh against the mitigating evidence available, and therefore as justification for imposition of the death penalty[.]" *Supra* ¶ 113. It thus determined the court's reference to Dr. Bean's report was error. *Id.* I respectfully disagree.

[¶127.]     In holding that the court erred, the majority analyzed whether this case should be evaluated under the principles of *Estelle* and concluded that it must. *Supra* ¶ 111. However, as the majority itself acknowledges, the *Estelle* Court cautioned that its holding is based on the "distinct circumstances" presented

therein. *Supra* ¶ 101. The Supreme Court reiterated that admonishment in *Penry* when it stated, "we have never extended *Estelle's* Fifth Amendment holding beyond its particular facts." 532 U.S. at 795, 121 S. Ct. at 1919. *See supra* ¶ 102. The facts of this case are not even remotely related to those in *Estelle*. As a result, I do not agree that this case should be evaluated under *Estelle's* Fifth Amendment holding.

[¶128.] There is no dispute that Berget did not put his mental status in issue. However, the majority claims that, like in *Estelle*, Berget's statement was "used *against* him during the capital sentencing proceeding." *Supra* ¶ 100 (emphasis added). I disagree. The language of the pre-sentence verdict demonstrates that despite the circuit court's reference to Dr. Bean's report, it still considered Berget's early acceptance of responsibility as a mitigating factor. Berget's statement, recounted in Dr. Bean's report and referenced by the court in the pre-sentence verdict, did not transform the mitigating evidence into aggravating evidence, which in turn, as the majority claims, "justifi[ed] . . . imposition of the death penalty." *Supra* ¶ 108.

[¶129.] The majority also maintains that, like in *Estelle*, "Berget had no notice that [his statement] would be used during . . . sentencing[.]" *Supra* ¶ 100. From the record, I would suggest that it is unclear whether Berget knew or suspected that the circuit court would review the report. At a motions hearing, defense counsel submitted Dr. Bean's report to the circuit court with the understanding that the report be kept "under seal." *See supra* ¶ 94. In my view, the circuit court could easily have interpreted the language "under seal" to mean that no one except the court was permitted to see the report. Thus, it was fair for the court to assume that

it was allowed to review the report. Moreover, in its colloquy with the court, defense counsel specifically stated: "[W]e are submitting [the report] to the [c]ourt for the [c]ourt's *consideration and review*." *Id*. (emphasis added). Surely, based upon defense counsel's statement, Berget would have suspected, at the very least, that the court would review the report.

[¶130.] As to the remaining facts, even the majority concedes that "notable distinctions" exist between this case and *Estelle*. *Supra* ¶ 100. Nonetheless, it reasons that those "distinctions . . . do not undermine [applying] the rationale of the Supreme Court's decision in *Estelle*." *Supra* ¶ 113. In reaching that conclusion, the majority molds the facts of this case to fit the "distinct circumstances" referenced in *Estelle*.

[¶131.] First, the majority notes that, unlike *Estelle*, Berget's statement to Dr. Bean was not used affirmatively by the State. *Supra* ¶¶ 106-07. In *Estelle*, the psychiatrist "testified for the prosecution at the penalty phase on the crucial issue of [the defendant]'s future dangerousness[.]" 451 U.S. at 467, 101 S. Ct. at 1875. Here, Berget's statement was used by the circuit court in its sentence-selection determination. Nevertheless, because the court used Berget's statement in a manner that supported the State's position, the majority contends this is no different than the situation present in *Estelle* where the psychiatrist essentially acted as "an agent of the [s]tate." *See supra* ¶¶ 99, 107. The majority stated, "Dr. Bean['s] report . . . was used to rebut evidence in mitigation of the crime, the relevance of which is to justify imposition of the death penalty, the position argued by the State." *Supra* ¶ 107. I disagree.

[¶132.] As previously stated herein, while Berget's statement may have softened the mitigating evidence, it was not tantamount to rebuttal evidence nor could it reasonably support a holding that it was aggravating or a "justification for imposing the death penalty." The circuit court merely observed that Berget may have had other motives for entering a guilty plea early. The circuit court clearly did not consider this evidence an *aggravating* factor, as suggested by the majority. Ultimately, Berget's early acceptance of responsibility was still considered as a mitigating factor.

[¶133.] Second, unlike in *Estelle* where the court ordered a psychiatric evaluation sua sponte, here, Berget's counsel sought and moved for the evaluation. *Supra* ¶ 100. In order to reach its conclusion that this case is not removed from evaluation under *Estelle*, the majority downplays this factor stating, "[b]ecause [Berget] did not place his mental status in issue[,] the fact that he moved for the psychiatric examination is of less importance[.]" *Supra* ¶ 108.

[¶134.] Further, the majority's reliance on *Devine* is misplaced. *Devine* held that "[t]he Fifth Amendment privilege bars the use of an incriminating statement made to a psychiatrist *for the purpose of proving a defendant's guilt*." 372 N.W.2d at 134 (emphasis added). *See supra* ¶ 110. Because "the Supreme Court made clear in *Estelle*[] [that] there is no distinction between the guilt and penalty phases of a *capital sentencing procedure* for purposes of applying the Fifth Amendment's protection against self-incrimination[,]" the majority contends *Devine's* holding requires application of *Estelle*. *Supra* ¶ 111 (emphasis added). *Devine* was not a capital sentencing proceeding. Thus, the majority should not rely on this Court's

holding in *Devine* in order to circumvent the Supreme Court's clear instructions that *Estelle's* Fifth Amendment holding must be limited to the "distinct circumstances" in that case. For the foregoing reasons, I do not believe that this case should be evaluated under *Estelle's* Fifth Amendment holding or that the court's reference to Dr. Bean's report was error.

[¶135.] Lastly, even conceding that the majority is correct in holding that the circuit court erred in considering Berget's statements to Dr. Bean, I am of the strong belief that the error was harmless. The error is harmless if we find beyond a reasonable doubt that the circuit court would still have imposed the death sentence if it had not considered Berget's statement to Dr. Bean. *See Younger*, 453 N.W.2d at 838 (explaining that constitutional violations are harmless "provided the court is able to declare a belief beyond a reasonable doubt that the error . . . did not contribute to the verdict obtained").

[¶136.] In choosing between life or death, the circuit court weighed the aggravating evidence against the mitigating evidence and determined that death was warranted.[17] The court's sentence is justified by the facts of this case and I am convinced it would not have changed had the court not considered Berget's statement to Dr. Bean. A review of the aggravating and mitigating evidence presented to the court demonstrates why.

---

17. In its pre-sentence verdict, the circuit court provided, "[W]hen weighing the mitigating circumstances presented and considered in this matter and finding that they do do [sic] not outweigh the aggravating circumstances of this crime, the only effective and reasonable retribution or punishment under the totality of the circumstances in this matter is the imposition of the death penalty."

[¶137.] The State presented a substantial amount of aggravating evidence[18] demonstrating, in part, the heinousness of the crime as well as Berget's extensive criminal history, hopeless chance of rehabilitation, and multiple attempts of escape. Although Berget presented mitigating evidence, the circuit court disagreed with it or concluded that it was not criteria for determining an appropriate sentence. Thus, in reality, the only mitigating evidence the court found relevant to its sentence-selection determination was Berget's early acceptance of responsibility.

[¶138.] The aggravating evidence in this case was overwhelming. If the circuit court had not considered Berget's statement to Dr. Bean during the weighing process, the mitigating evidence would still have failed to outweigh the significant and often undisputed aggravating evidence. Thus, I firmly believe the sentence would still have been death.

[¶139.] Accordingly, I would affirm the judgment below and uphold the sentence.

---

18. The court considered the facts of Johnson's murder which, due to the manner in which Berget caused Johnson's death, demonstrated an extreme indifference to human life and an obvious attempt to end Johnson's life. Moreover, the State introduced victim-impact testimony, photographs illustrating the circumstances of Berget's 2003 attempted murder conviction, and victim testimony. The court observed that Berget showed no remorse except what Berget purportedly shared with his attorney and/or paralegal. Berget's prior criminal record included ten convictions, three of which were escape convictions. Not to mention, his criminal conduct was becoming more violent in nature. In addition, while an inmate at the penitentiary, Berget was disciplined at least four times for escape activities, he was found on numerous occasions to have contraband on his person or under his control, and he was classified as a maximum security risk since 2003.